# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **COLONIAL PIPELINE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:20-CV-00666** |
| **v.** | ) | |
| | ) | **Judge William L. Campbell, Jr.** |
| **METROPOLITAN NASHVILLE** | ) | **Magistrate Judge Alistair E. Newbern** |
| **AIRPORT AUTHORITY; and AECOM** | ) | **JURY TRIAL DEMANDED** |
| **TECHNICAL SERVICES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

| | | |
|---|---|---|
| **METROPOLITAN NASHVILLE** | ) | |
| **AIRPORT AUTHORITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:20-CV-00809** |
| **v.** | ) | |
| | ) | **Judge William L. Campbell, Jr.** |
| **COLONIAL PIPELINE COMPANY,** | ) | **Magistrate Judge Alistair E. Newbern** |
| | ) | |
| **Defendants.** | ) | |

## METROPOLITAN NASHVILLE AIRPORT AUTHORITY'S RESPONSE IN OPPOSITION TO COLONIAL PIPELINE COMPANY'S MOTION TO DISQUALIFY ITS COUNSEL[1]

The Motion to Disqualify ("Motion") filed by Colonial Pipeline Company ("Colonial") in

these two cases is a tactical motion that mixes cynicism with uninformed fantasy about events

from about 20 years ago to concoct a baseless disqualification claim. Colonial's own filings show

---

[1] On June 10, 2021, the Court held a status conference to discuss the logistics of submitting certain materials that Colonial claims are privileged or that discuss documents Colonial claims are privileged. The Court instructed such materials be submitted *in camera*. Consistent with the Court's directive, a redacted version of this Response is being filed in the CM/ECF system and an un-redacted version of this Response is being submitted *in camera* to the Court.

that Waller's current representation of the Metropolitan Nashville Airport Authority (the "Airport") and its *de minimis* 2002 representation of Colonial are not substantially related. Also, there is no risk that any confidential factual information disclosed in that 2002 representation (there is evidence of none) would either prejudice Colonial or give the Airport an advantage in either of the two lawsuits. Indeed, none of the information in the documents Colonial relies upon to support its Motion contains information (confidential or otherwise) that is material to any of the claims and defenses in either of these two, current cases.

In the end, Colonial's Motion is just another ploy to delay this litigation. Balancing (i) Colonial's baseless claims that the Airport's counsel has engaged in unethical conduct, conveniently raised with the Court for the first time on the eve of Court ordered discovery deadlines, against (ii) the guiding rules of professional conduct, including the Airport's right to select its counsel of choice, the undue hardship disqualification would cause the Airport, and the negative message disqualification would send to the public and the bar, the Court should exercise its discretion to deny the Motion.

## PRELIMINARY STATEMENT

There are two current lawsuits in which the Airport and Colonial are adverse to each other. (*See generally Colonial Pipeline Company v. Metropolitan Nashville Airport Authority, et al.*, Case No. 3:20-cv-00666 [the "Line Strike Suit"] and *Metropolitan Nashville Airport Authority v. Colonial Pipeline Company*, Case No. 3:20-cv-00809 [the "Relocation Suit"]). The first, filed by Colonial on July 31, 2020, seeks damages from the Airport and its contractor AECOM, arising out of a 2019 strike of the Colonial pipeline that runs through Airport property at the Nashville International Airport. (*See generally* Line Strike Suit, DE 26.) The Line Strike Suit alleges that the Airport violated a 1976 Easement Agreement between the Airport and Colonial and committed

other torts in not preventing the 2019 line strike.  (*See id.*)  As a practical matter, the relevant events in the Line Strike Suit occurred either on the day of the strike or in the immediate time period before and after the strike.

The Relocation Suit relates to Colonial's recent foot dragging (*i.e.* post-2018) with regard to relocating its pipeline consistent with the requirements of the 1976 Easement Agreement.  The second lawsuit recounts Colonial's *recent* failures and delays in complying with its contractual obligations and seeks to compel Colonial to relocate its pipeline consistent with Colonial's clear obligations under the 1976 Easement Agreement between the parties.  (*See generally* Relocation Suit, DE 1.)

Long before the first of the two lawsuits was filed about a year ago, the Airport has been represented with respect to these disputes by the undersigned attorneys associated with Waller Lansden Dortch & Davis, LLP ("Waller") and Colonial has been represented by attorneys associated with Bass Berry & Sims ("Bass").

Waller provided legal services to Colonial in the distant past, and that relationship ended in or around 2004.  Bass also represented the Airport in the past and James Cheek, who is presently an attorney at Bass, was *the Chairman of the Airport's Board of Commissioners for a decade from 2003 to 2013*.  In the course of that work, Mr. Cheek undoubtedly came into possession and knowledge of an enormous wealth of confidential information related to the Airport's business, litigation history, and its expansion plans that could, theoretically, be used against the Airport and all of which would be imputed to Bass.[2]

---

[2] See www.bassberry.com/professionals/cheek-james-h/.  *See also* The Supreme Court of Ohio, Board of Commissioners on Grievances and Discipline, Opinion 2008-2 attached to this Response as **Exhibit 1**.

4846-0779-3901

Even though neither Bass nor Colonial has responded to the ethical challenges arising out of a current Bass partner serving as former Chairman of the Airport's Board, the Airport has chosen not to press this issue because it recognizes that disqualification motions (i) drive up the cost and expense of litigation, (ii) attempt to deprive a client of its chosen counsel, and (iii) cause delay and hostility within a litigation. Indeed, the words frequently used by courts for disqualification motions are "disfavored" and "sensitive," reflecting that discretion is often the better part of valor when it comes to disqualification motions, unless the case is obvious.

Colonial and its litigation counsel have taken a different approach, creating increased cost, needless delay, and making baseless accusations of lawyer misconduct in an effort to manufacture a disqualifying conflict where none would otherwise exist. For the past several months, Colonial and its litigation counsel have -- based on the discovery of a single, banal invoice from 2002 -- thrust upon Waller a duty to locate files that have not been seen or reviewed by Waller lawyers for decades and to investigate Colonial's claims that Waller attorneys are disqualified from representing the Airport in this litigation. Waller has turned over the requested files, including a file of central interest to Colonial called the "Airport Authority" file.

Colonial has been provided the "Airport Authority" file, and Colonial's Motion does not even attempt to argue that information contained in the Airport Authority file is harmful to Colonial in this litigation or that it would give the Airport an unfair advantage. In fact, there is no evidence that the information could impact the trial of either the Line Strike Suit or the Relocation Suit in any way. A review of time entries confirms this point, as they show that two former Waller lawyers entered a combined total of 7.9 hours on the "Airport Authority" matter, and this work ended 19 years ago. Consistent with the file, based on their time entries, these lawyers also did not perform any work substantially related, or in any way material, to the issues in dispute in the

current litigation. Undeterred, Colonial presses forward with its distraction, forcing the Airport and the Court to expend considerable time and resources catering to Colonial's fever dream that there is a potential conflict in this case.

With the investigation establishing that the work performed for Colonial on the "Airport Authority" matter 19 years ago was (1) *de minimis* and (2) performed by Waller attorneys who have long left the firm, Colonial has shifted tack. Now Colonial's primary argument appears to be that Waller should be disqualified because the Airport's lead trial counsel, Paul Davidson, recently reviewed the Airport Authority file. Colonial ignores that Mr. Davidson reviewed the file not to gain any benefit, but in consultation with Waller's General Counsel (who also serves as the firm's ethics counsel) during the course of the firm's investigation of Colonial's conflict claims. That is, once the conflict allegation was thrust upon him by Colonial's litigation counsel, Mr. Davidson reviewed the file on advice of ethics counsel only in order to comply with his and the firm's ethical obligations and *Colonial's demand for documents.*

Colonial's brand of "gotcha" litigation is cynical gamesmanship in the extreme. There is no evidence that Mr. Davidson sought to obtain (or did obtain) an advantage in this litigation by reviewing the file, that the information in the file is material to any claim or defense in this litigation or is otherwise harmful to Colonial in this litigation. If this was ever a legitimate conflict inquiry, it has ceased to be. This has become a chess game, where Colonial seeks leverage and a strategic advantage on account of an invented impropriety. If Colonial "wins" its tactical disqualification motion, it will have achieved its goal of delaying the litigation, of delaying the relocation of its pipeline, and of driving up the costs to the Airport, and no legitimate purpose of the professional conduct rules would be served. The Airport respectfully requests that the Court exercise its discretion to deny Colonial's Motion.

## **BACKGROUND**

On or about January 11, 2021, that is, after these cases had been pending since July and September 2020, Colonial's counsel Drew Goddard called Mr. Davidson claiming that Waller may have a conflict in representing the Airport in this litigation because Colonial recently discovered an invoice from Waller indicating that Waller had provided advice and counsel to Colonial pertaining to the Airport. (*See* Declaration of Paul Davidson [Davidson Decl.] at ¶ 6.) Bass counsel sent Mr. Davidson a copy of this Waller invoice from March 13, ***2002***, in a matter called "Airport Authority" in which a long former Waller attorney named Mike Mizell had performed 4.9 hours of work in February 2002. (*See id.*; *see also* Ex. A to Motion). Because the work referenced was performed about ***19 years ago and by an attorney who left Waller about 11 years ago***, Mr. Davidson had no idea what that work was or the substance of it. (*Id*. at ¶ 9.) However, in the interests of fierce compliance with the ethical rules, Mr. Davidson immediately notified the Airport and his firm's General Counsel of the invoice and the conflict allegation. (*Id*. at ¶ 8.)

At the request of Colonial's counsel, Waller pulled the "Airport Authority" file (the file to which Mr. Mizell's time was billed) and other files related to work done on behalf of Colonial from offsite storage. (*Id*. at ¶¶ 12, 13.) The files were scanned and delivered to Bass/Colonial for their review and at their request. (*Id*. at ¶ 14.) At no time prior to the transmission of the information from Waller to Bass did Bass counsel warn or instruct Waller counsel not to review any of the material that was being transmitted; in fact, it was understood in conversations between counsel that Mr. Davidson would need to review the files in order to determine whether the material was responsive to the Bass/Colonial request. (*Id.* at ¶¶ 15, 16.)

For instance, in addition to seeking the "Airport Authority" file, Bass counsel was interested in a "General" file that Waller had kept for Colonial representations in this same time

period about 17-23 years ago. (*Id.* at ¶ 17.)  On February 3, 2021, Mr. Goddard emailed Mr. Davidson and said "[w]hen we first spoke about possible conflicts, I noted that some of Waller's work for Colonial was billed to a 'General' matter [] and I asked that the files for it be reviewed. **Can you confirm that Waller has reviewed the files for that matter and nothing related to MNAA is included in them**?" (*Id.*) (emphasis added).  Mr. Davidson and Mr. Goddard then had a further email discussion about Waller invoices, and Mr. Goddard stated "Colonial also requests copies of all Waller bills to Colonial for the Airport matter and the General matter."  (*Id.*) Obviously, one would need to review a bill to see what it was and whether it was for the appropriate matter.  Again, at no time prior to submission of the material to Colonial's counsel did Mr. Goddard instruct Mr. Davidson not to review *any* file; in fact, a fair reading of Mr. Goddard's emails is that Bass/Colonial *expected* that Waller would review the files before sending along to Bass.  (*Id.*)

In order to assess whether Waller's previous representation was substantially related to the current litigation and to make sure the proper information was being delivered to Bass/Colonial, Mr. Davidson and Waller's General Counsel agreed that they should both review the general content of the "Airport Authority" file prior to submitting the material to Bass.  (*Id*. at ¶ 19.)  A review of that material, combined with an understanding of the actual allegations and claims in the two cases, confirmed to Mr. Davidson and the firm's General Counsel that Waller was and should not be disqualified from continuing to represent the Airport in this litigation.

Simply put, there was no confidential factual information in the file, the materials in the file had essentially no relation to the specific claims, allegations, and defenses in the two cases, and there was nothing in the file that would either harm Colonial or advance the Airport's position in the lawsuits.  (*Id*. at ¶¶ 21-28.)  Indeed, the "Airport Authority" file is an amorphous smattering

of ancient documents. (*Id.* at ¶ 21.) Many of the documents in the "Airport Authority" file have nothing to do with the Airport or the Easement Agreement. (*Id*.)

Colonial's Motion calls out six documents, three of which were in the Airport Authority file. (Line Strike Suit DE 71 at 5-6.) These three documents in the Airport Authority file were not authored by anyone at Waller. Nor is anyone from Waller an addressee on the documents. Again, the three documents are (i) a March 4, 1992 letter from a Bass attorney to Colonial giving a legal opinion (no client confidences disclosed), (ii) a September 11, 2000 memo/letter from a Colonial in-house lawyer that mentions the 1992 Bass letter (no client confidences disclosed); and (iii) an October 19, 2000 email from a Colonial in-house lawyer (no client confidences disclosed). (Line Strike Suit DE 71 at 6.) Again, no Waller attorney is on any of this correspondence.

Colonial declines to discuss the substance of these three documents, claiming they are confidential and privileged. (*Id.* at 6.) The Airport may discuss them here, because the Airport and its counsel have the right to use material necessary to "establish a claim or defense" in a controversy between counsel and the former client. *See* Tenn. R. Prof. Conduct. 1.6(b). In deference to Colonial's claim of privilege, however, the discussion of these materials is redacted in the publicly filed version of this Response and the Davidson Declaration, with sealed versions of those materials containing the discussion of the materials.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



In its Motion, Colonial also discusses three documents that were not in the Airport Authority file and were apparently independently located by Colonial. First, Colonial presents a conflict check showing that on, March 27, 2001, Leslie Shechter (an attorney who left employment with Waller in 2003, *see* Davidson Decl. at ¶ 24) opened three matters for Colonial Pipeline, one of which involved potential work related to "relocation of pipeline on property newly acquired by Airport Authority. Determine contractual obligations to relocate based on easement agreements between CPC and Airport Authority for existing property owned by Airport Authority." (Line Strike Suit DE 71 Ex. C.) For reasons that are unexplained, two weeks later Ms. Shechter prepared a similar conflict check, which likewise referenced potentially providing support to Colonial related to "relocation of pipeline," and listed "Airport Authority" as the adverse party. (Line Strike Suit DE 71 Ex. B.) The third document is the invoice that started this whole dispute, the March 2002 Waller invoice showing Mike Mizell billing 4.9 hours to the Airport Authority matter.

As is known by all the lawyers involved in this current litigation, a conflict check is run based on the *possibility* of a representation, not the fact of it, and the work actually performed

following a conflict check may not be significant. That appears to be what occurred here. That is, in conjunction with responding to Colonial's claims of ethical violations, Waller was able to pull the time records for the Airport Authority matter, which are presented here on an Excel Spreadsheet. (Davidson Decl. Ex. 4.) While some of the records no longer have the date for some of the work that was performed, the records show that *de minimis* work was actually performed on the "Airport Authority" matter. (*Id*.)

In the entire Airport Authority matter spreadsheet, there are six time entries. (*Id*.) Ms. Shechter entered a total of .4 hours of time for the entire matter; .2 hours for a "telephone call with T. Mock" and .2 for "review email and respond," with those entries spaced about a year apart in 2001 and 2002. (*Id*.) Meanwhile, Mike Mizell (who left employment with Waller in 2010 [Davidson Decl. at ¶ 8]), billed a total of 7.5 hours to the entire matter, all about a year after the file was opened. (Davidson Decl. Ex. 4.) These spreadsheet entries match the two invoices for the "Airport Authority" file that have been located. (Compare Davidson Ex. 4 with Line Strike Suit DE 71 Ex. A and Davidson Decl. Ex. 5.) These entries show Mr. Mizell doing basic background research and apparently using public sources to investigate the Airport's expansion plans as of 2002. (*See id.*) Thus, the total engagement time for the two former Waller lawyers who entered time into the Airport Authority matter was 7.9 hours, less than a day's work, about 20 years ago.

Again, a review of the time entries suggests that this work was foundational, that is, basic background work and research into publicly available documents. There are no Waller memos to the client, emails, notes of phone calls or anything of that ilk. It does not appear Waller lawyers

did anything more than background work, and it does not appear they provided any guidance on anything of consequence to this dispute, and, if somehow they did, it is lost to history.[3]

Forcing the Airport to change counsel at this point in the litigation would cause extreme prejudice to the Airport, as it would delay the proceedings and force the Airport to incur the time and expense associated with getting substitute counsel familiar with the claims, defenses, and developments in this case. (Davidson Decl. at ¶ 35.) It would also serve no legitimate end, and would rather encourage litigants to use disqualification motions and the rules of professional conduct as weapons of delay, increased cost, and unwarranted advantage.

## ANALYSIS AND ARGUMENT

### I.     Standard of Review

On a Motion to Disqualify, the Movant has the burden of proving that opposing counsel should be disqualified. *McKinney v. McMeans*, 147 F. Supp. 2d 898, 900-901 (W.D. Tenn. 2001). The Court "must satisfy itself that an adequate evidentiary record exists, permitting later appellate review." *Id.* Akin to a summary judgment motion, courts may "rely on sworn affidavits and other evidence in the record, but may not decide disputed issues of fact." *Id.*

The "federal courts have a duty and responsibility to supervise the conduct of attorneys who appear before them and to take measures against unethical conduct occurring before them. ***Courts must also guard against such motions being used to secure a tactical advantage in the***

---

[3] As noted above, Exhibit A to the Motion was not in the Airport Authority file. Exhibit 5 to the Davidson Declaration was in the Airport Authority file, but through administrative oversight, it was omitted from the file when it was first sent to Bass. (Davidson Decl. at ¶ 26.) After the oversight was identified, the invoice was sent to Bass. Bass/Colonial also apparently identified one additional email from Colonial to Ms. Shechter (which was likewise not in the Airport Authority file), and has indicated an intent to file that email under seal subsequent to its Motion filing. Undersigned counsel has not seen this email, and, given Bass/Colonial's "gotcha" tactics, has no desire to.

4846-0779-3901

*proceedings*." *Bartech Indus. v. International Baking Co.*, 910 F. Supp. 388, 392 (E.D. Tenn. 1996) (emphasis added). Recognizing this, courts have found that disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Board of Educ.*, 17 F.3d 1059, 1066 (7th Cir. 1994) (*citing Freeman v. Chicago Musical Instrument Co*., 689 F.2d 715, 721 (7th Cir. 1982)). Disqualification motions "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman* at 721.

Indeed, "[c]ourts view motions to disqualify counsel unfavorably and grant them only when necessary because they are drastic measures." *Harbin Enters. Gen. P'Ship v. Ingram Micro Inc*., No. 05-2942, 2007 U.S. Dist. LEXIS 105259, *14 (W.D. Tenn. Aug. 15, 2007) (*citing Official Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp*., 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999)); *Boyle v. Evolve Bank & Trust & Evolve Fin. Group*, No. 16-02171, 2017 U.S. Dist. LEXIS 231601, *12-13 (W.D. Tenn. 2017) ("Motions to disqualify are disfavored, however, as disqualification is a drastic measure that courts should hesitate to impose except when absolutely necessary . . . Courts must be vigilant in reviewing motions to disqualify counsel as the ability to deny one's opponent the services of capable counsel is a potent weapon that can be misused as a technique of harassment." (internal citations and quotations omitted). In sum, "**a court should only disqualify an attorney when there is a reasonable possibility that some specifically identifiable impropriety actually occurred**." *Boyle* at *13 (internal citations and quotations omitted) (emphasis added).

In resolving a disqualification motion, federal courts in Tennessee primarily rely on the applicable Tennessee Rules of Professional Conduct. *Harbin* at *15 (*citing Nat'l Union Fire Ins. Co. v. Alticor, Inc*., 472 F.3d 436 (6th Cir. 2007)); *Harvey v. Allstate Ins. Co.*, No. 03-2721MlV, 2004 U.S. Dist. LEXIS 30138, at *16 (W.D. Tenn. Dec. 16, 2004). Ultimately, analysis turns on

the particular facts of each case as applied against the Rules of Professional Conduct. *Id.* The District Court retains broad discretion, and the Court "should consider the ends that the [applicable] disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Garland v. Ford Motor Co.*, No. 2:12-00121, 2015 U.S. Dist. LEXIS 38505, *21-22 (M.D. Tenn. 2015) (internal quotation omitted).

Again, disqualification is an extreme remedy, and the Court retains discretion to fashion a remedy short of disqualification under the appropriate circumstances. *See Myers v. Porter (In re Estate of Myers),* 130 P.3d 1023, 1027 (Colo. 2006) (requiring a showing "that *any remedy short of disqualification would be ineffective*.") (emphasis added); *Guillen v. City of Chicago*, 956 F. Supp. 1416, 1424 (N.D. Ill. 1997) ("remedies less drastic than disqualification are available to solve any problems that might arise during the discovery process"); *In the Interest of G.L.P.,* 131 A.3d 90, *18 (Pa. Super. Aug. 12, 2015) ("Disqualification of a party's chosen counsel is a severe act. There is no evidence in this record that court did not have other less dramatic options.")

## II.     Rule 1.10(b) Governs This Dispute

The primary Tennessee Rule of Professional Conduct at issue in this dispute is Rule 1.10(b).  Rule 1.10 governs the issue of "imputed disqualification," which is the issue raised when an allegedly conflicted lawyer has left the firm that the movant seeks to disqualify. *See Jordan v. Kohl's Dep't Stores, Inc*., No. 3:10-cv-0051, 2010 U.S. Dist. LEXIS 134060, *11 (M.D. Tenn. 2010).[4]  Here, it is undisputed that undersigned counsel has no direct conflict of interest from the

---

[4] Colonial spends the final pages of its brief discussing the three-part test for disqualification in the Sixth Circuit's 31-year-old *Dana* case.  (Line Strike Suit DE 71 at 15-17, citing *Dana Corp. v. BlueCross BlueShield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990)).  As the Colonial brief recognizes, the continuing independent viability of *Dana* in light of the standards set forth in

4846-0779-3901

2001-2002 Colonial representation. The only lawyers who would even theoretically have a direct conflict would be Leslie Shechter and Mike Mizell, who left Waller 18 and 11 years ago, respectively.

As Judge Trauger quoted in *Jordan*, "when a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless: (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter." *Id.* (quoting Tenn. R. Prof. Conduct 1.10(b)) (case specific modifications removed). That is, the matters must be "substantially related" and a lawyer at Waller must have confidential information that is material to the current matter. *Id.*

### III. There is No Substantial Relationship Between the Current Matters and the 2001-2002 Engagement

Colonial has not come close to meeting its burden to show that the matters at issue here are the same or substantially related. First, because Colonial is dredging up a forgotten relationship from two decades ago, it is impossible to say what the previous "matter" actually involved. While the conflict checks prepared by Ms. Shechter suggest an optimism for a broader engagement, the only actual representation shown in the file and time records is about 7 hours of research and document review by an associate into the Airport's future expansion plans as of 2002 and the

---

Tennessee's Rules of Professional Conduct is questionable. In any event, *Dana* does not address conflicts that might be imputed to a firm based on the work of former counsel, which is the issue here. That issue is governed by Rule 1.10(b). Judge Trauger's analysis in *Jordan* soundly recognized that *Dana* and the Tennessee Rules of Professional Conduct both require a "substantial relationship" between the two representations, but 1.10(b) provides the source of the required further analysis should a "substantial relationship" be found.

underlying public documents (the easements), along with a couple of phone calls, emails and conversations, all of which appeared to go nowhere significant. The "Airport Authority" matter appears to be *de minimis*.

The present "matter" is obviously much different. Undersigned counsel represents the Airport in two lawsuits, and an analysis of the claims and defenses in the those two cases (an analysis Colonial does not seriously attempt) shows that the earlier representation is not "substantially related" to this representation.

### i. The claims and defenses in the Line Strike Suit arise exclusively out of a 2019 incident, and have nothing to do with any advice or counsel that would have been provided in 2001 or 2002

Colonial's Line Strike Suit, filed on July 31, 2020, arises out of a puncture of Colonial's gas line on the Airport's property that occurred on April 9, 2019. Colonial's suit asserts six causes of action, including (1) breach of contract against the Airport, (2) negligence against both the Airport and AECOM, (3) trespass against AECOM, (4) wrongful interference with easement against AECOM, (5) contribution under the Oil Pollution Act against the Airport and AECOM, and (6) declaratory judgment against the Airport and AECOM. (*See generally* Line Strike Suit DE 26.) On October 5, 2020, the Airport filed an answer and counterclaims, asserting causes of action against Colonial for (1) negligence, (2) negligence per se, (3) breach of contract, (4) trespass, and (5) declaratory judgment, based primarily on Colonial's failure to adequately mark its lines in response to 811 notifications from the Tennessee Department of Transportation. (*See generally* Line Strike Suit DE 26, 34.)

Each and every one of the claims and defenses in the Line Strike Suit relates to events that occurred in 2019 or after, 17 or more years after the previous "matter" concluded. (Davidson Decl. at ¶ 27.) For instance, Colonial's negligence claim asserts that the Airport should have used more

care to make sure those who were doing soil borings at the Airport knew where the pipeline was. (*See* Line Strike Suit DE 26 at 12-13) ("MNAA and AECOM knew or should have known they were in the vicinity [even near vicinity] of Colonial's easement and pipeline, and that performing, authorizing, observing, facilitating, and/or directing drilling in the area of Colonial's pipeline, without contacting Colonial or taking other appropriate action, could result in a strike of the pipeline.")

The Breach of Easement Agreement claim Colonial asserts rests on the same theory, and any analysis (by anyone) of the Easement Agreement prior to 2019 would have no relevance to this particular claim, because Colonial's claim argues that the 2019 conduct violated the Easement Agreement. (*See* Line Strike Suit DE 26 at 11-12.) Colonial has an Oil Pollution Act claim that relates to apportionment of fault for the 2019 gasoline spill and the alleged failure to properly clean up the site post incident, which obviously has nothing to do with anything that occurred prior to 2019. (*Id.* at 15-16.)

The story is similar for the Airport's counterclaims. The Airport alleges that Colonial should have marked its lines prior to the soil boring work, and the failure to do so was negligence, breach of contract, and trespass. (*See e.g.* Line Strike Suit DE 34 at 19-20) ("Colonial knew or should have known that its failure to access the secured area to mark its lines and its failure to contact or warn the Airport could result in a strike of the pipeline. . . . A reasonably prudent utility operator would have . . . adequately marked its facilities.") Again, all of these claims and defenses in the Line Strike Suit arise of out events in 2019; events that could not have possibly been advised upon, and are not related, let alone substantially related, to whatever *de minimis* guidance Waller provided or attempted to provide Colonial in 2001 or 2002.

ii.     **The claims and defenses in the "Relocation Suit" likewise have nothing to do with any advice or counsel that would have been provided in 2001 or 2002**

In the Airport's Relocation Suit, the Airport asserts two counts, for declaratory judgment and for breach of contract. (*See* Relocation Suit DE 1.) On September 30, 2020, Colonial filed an answer and counterclaim asserting one count for declaratory judgment. (Relocation Suit DE 8). An analysis of the claims at issue in this case versus the 2001-2002 representation shows clearly, once again, that there is no "substantial relationship" between the two matters.

In the Relocation Suit, Colonial has asserted three primary arguments to claim that it has no obligation to accede to the Airport's demand that Colonial move its pipeline. (Davidson Decl. at ¶ 28.) First, Colonial claims that the Easement Agreement, which establishes the obligation to move the pipeline in Section 3, is no longer enforceable because the Airport committed the first breach of the Easement Agreement through the 2019 Line Strike. (*Id.*) Second, Colonial claims that portions of its easement that were previously relocated in 1986/87, 1992, and 1998 are no longer subject to the Easement Agreement because the legal description of the easement location is incorrect. (*Id.*) Third, Colonial claims that, in 2000, it declined to sign a proposed amendment to the Easement Agreement that would have updated the location of the easement. (*Id.*)

Nothing in the previous representation has anything to do with these issues. Based on the invoices and time entries of the Waller lawyers, it appears that the previous representation consisted of reviewing background documents and investigating non-confidential information **about the Airport's future expansion plans**. (Davidson Decl. Ex. 4.) Consistent with this, the Airport Authority file does not suggest that Waller provided advice on any of the issues or defenses that are now at play in the Relocation Suit. That is, Waller obviously could not advise on the impact of the 2019 line strike on the Easement Agreement obligations in 2001/2002, and there is nothing in the time entries related to the previous relocations of the pipeline or their impact on the

4846-0779-3901

parties' obligations under the Easement Agreement. Moreover, there is no evidence that Waller was asked in 2001/2002 to give any legal advice regarding Colonial's alleged refusal to sign the amended Easement Agreement, which occurred in 2000. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

### iii. There is no "substantial relationship" between the current and past representations

The term "substantially related" is defined in the commentary to Tennessee Rule of Professional Conduct 1.9. That is, "[m]atters are 'substantially related' . . . if they involve the same transaction or legal dispute or other work the lawyer performed for the former client or if there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter, unless that information has become generally known." Tenn. R. Prof. Conduct 1.9 (Comments); *see also Boyle* at *15.

The current and past representations do not involve the "same transaction or legal dispute or other work." The current representation in the Line Strike Suit relates to a 2019 line strike. There is also an associated dispute about whether Colonial needs to move its pipeline, which

---

[5] The Easement states at Section 3: "Colonial will relocate its easements, either those existing on property now owned or hereafter acquired by the Metropolitan Nashville Airport Authority, at its sole cost and expense upon notification by the Metropolitan Nashville Airport Authority that its lines interfere with the expansion, development, and/or construction undertaken or to be undertaken by the Metropolitan Nashville Airport Authority, its successors, assigns, agents, or employees."

4846-0779-3901

Colonial defends by arguing issues that either could not have been or apparently were not involved in the *de minimis* prior representation.

Similarly, Colonial cannot show that "there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." The record reflects no confidential factual information obtained in the prior representation. The work actually done by Waller was *de minimis*, and the other referenced documents in the "Airport Authority" file simply state the obvious, that there is an Easement Agreement that Colonial has obligations under. Moreover, that information, even if it held some secrecy or intrigue at the time (which it likely did not), is certainly generally known now, further gutting any claim there is a "substantial relationship" between the relevant "matters."

The analysis could end here. The representations are not "substantially related," and thus there is no reason to proceed to the next step in the analysis, which is the question of imputation under Tenn. R. Prof. Conduct 1.10(b). For purpose of completion, the Airport will also address this argument.

## IV. Any Conflict is Not Imputed to Current Waller Counsel

Given that the Waller attorneys with the alleged conflict have (long ago) left Waller, Rule 1.10(b) allows undersigned Waller counsel to represent the Airport, even if the current representation and the past representation were substantially related (which they are not) so long as no "lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) **that is material to the matter**." Tenn. R. Prof. Conduct 1.10(b) (emphasis added).

Incredibly, Colonial never applies this test. It claims that Waller has "access to" Colonial's "confidential" files, and it claims that Mr. Davidson has "reviewed at least some of those

confidential files." (Line Strike Suit DE 71 at 14.)  That's it. In four or five lines, that is Colonial's

sole argument for imputation.  After five months of haranguing Waller about these issues, Colonial

makes no effort to establish (1) that the referenced material in the Airport Authority file is actually

confidential in any meaningful sense and (2) that the referenced documents in the Airport

Authority file are "material to the matter."   (*See id*.)  Once again, the analysis could end here; it

is Colonial's burden to establish the requisite elements under Rule 1.10(b) and it does not even

attempt to do so.   Nonetheless, the Airport explains why the Rule 1.10(b) standard for

disqualification could never be met in this case.

First, it is debatable at this point whether any of the referenced material in the Airport

Authority file can fairly be considered confidential.  ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████  (*See* Davidson Decl. Exs. 1-3.)  This fact, which has been discussed in

public pleadings in this present dispute, can fairly be classified as "generally known" and thus not

confidential.  *See* Tenn. R. Prof. Conduct 1.9(c).

It is even more clear that the referenced documents in the Airport Authority file are not

material to the present proceedings.  The claims and defenses in the Line Strike Suit relate to that

2019 event and events thereafter.  There is nothing in the Airport Authority file that could ever be

used for any benefit or advantage in the Line Strike Suit.

There is also nothing in the referenced documents that is material to the Relocation Suit.

The claims and defenses in the Relocation Suit deal with Colonial's foot dragging post 2018, not

20 years ago.  ████████████████████████████████████████████████████

4846-0779-3901

██████████████████████████ Everyone knows that now. The fight now is about a 2019 line strike and a few other events about which Waller provided no advice and counsel. Nothing in the file could be used by Waller to gain a material advantage in this new dispute.

## V.        Disqualification is Not Warranted Given the Balance of Harm

Colonial has filed a tactical disqualification motion on the eve of scheduled depositions based on speculation of some client factual confidence that it cannot identify. Colonial has not and cannot show that the information in the documents it relies upon to support its motion will harm Colonial in this litigation or impact the trial of these two cases in any way. There is no discussion in Colonial's Motion of any harm to Colonial. Not surprisingly, there is also no discussion of the disproportionate harm to the Airport if it is deprived of its choice of counsel at this stage of the litigation. If Colonial had valid concerns the documents or information contained therein might be prejudicial, there are remedies far short of disqualification of the Airport's counsel that could be used to address those concerns.[6]

Under the circumstances, including the fact that Colonial has not come forward with any evidence that Waller has gained knowledge (improperly or otherwise) of any confidential factual information related to the claims and defenses in these two cases, it is appropriate for the Court to consider the hardship to the Airport if it was subject to the draconian sanction of having its counsel disqualified. *See, e.g.,* Judge Sharp's opinion in *Garland v. Ford Motor Co.,* No. 2:12-00121,

---

[6] Indeed, Waller and the Airport have offered to have Waller send the Airport Authority file to Bass and to employ all commercially reasonable efforts to destroy and delete any electronic copies that may exist of the file. Waller and the Airport have further proposed to Colonial that the parties simply agree not to use anything from their firms' prior representations of the now adverse party. This seems like an entirely reasonable resolution to this dispute, and, while Waller and the Airport would make this offer in any event, it is a particularly easy offer to make in this case, given that the information in the Airport Authority file is worthless.

4846-0779-3901

2015 U.S. Dist. LEXIS 38505 (M.D. Tenn. 2015) (refusing to disqualify counsel whose firm contemporaneously represented both parties in the litigation and was found to have a direct conflict of interest in violation of Rule 1.7 TRPC.)

The Airport retained Waller and the undersigned counsel in 2019, shortly after the line strike occurred. Since 2019, Waller has undertaken significant investigation of the facts and circumstances leading up to and after the strike, including Colonial's foot dragging with respect to relocation of the pipeline to make way for the Airport's expansion. It has retained and worked with environmental and damages experts, met with representatives of the Tennessee Department of Transportation ("TDOT") and the Tennessee Department of Environment and Conservation ("TDEC"), participated in lengthy pre-suit discussions with Colonial and its litigation counsel; participated in a lengthy mediation after the suits were filed, gathered and reviewed documents from the Airport, TDOT and multiple third parties; worked with claims counsel at two different insurance companies; prepared documents for production, prepared for depositions and participated with opposing counsel in numerous meet and confers and court conferences regarding the scope of discovery.

The two cases have been pending since July and September of 2020. Colonial has known about the alleged conflict since at least February 2021. The parties entered mediation at that time, but nevertheless after the mediation terminated on March 16, 2021, Colonial chose not to pursue disqualification until May 21, 2021, more than two months later.[7] During that time, Colonial's

---

[7] As a condition to entering and continuing mediation Colonial insisted that the Airport enter two limited conflict waiver agreements. Copies of the two limited waivers are attached to the Davidson Declaration as Exhibit 6. The waivers expired upon the termination of mediation. The mediation terminated on March 16 and the parties notified the Court that mediation was unsuccessful on March 19. (*See* Line Strike Suit DE 57.) It is remarkable that Colonial waited another two months, and until the eve of major discovery events in this case, to finally file its Motion.

4846-0779-3901

counsel engaged in multiple conferences with the Airport's and AECOM's counsel to discuss discovery issues, scheduling document production and depositions. The Court held a conference on March 23, 2021 (*see* Line Strike Suit DE 58) to discuss discovery. The parties jointly presented their detailed discovery plan to the Court on March 31, 2021. (*See* Line Strike Suit DE 59). The Court held another conference on April 1, 2021, and on April 5, 2021 entered orders regarding the discovery of ESI, the protection of confidential information and a joint discovery plan for the two cases. The Parties thereafter jointly filed status reports regarding the progress of discovery to the Court on April 15, May 5 and May 7. (*See* Line Strike Suit DE 63, 64, 65). The Court then held another discovery conference on May 10, 2021, which resulted in a discovery order the same day. (*See* Line Strike Suit DE 66). In none of these conferences or reports did Colonial inform the Court that it believed the Airport's counsel was or should be disqualified.

Pursuant to the Court Ordered Joint Discovery Plan, discovery should proceed expeditiously with trial dates that are rapidly approaching. Colonial's filing of the Motion (shortly after the Court ordered Colonial to answer Interrogatory 1 in the Relocation Suit and to include its in-house counsel in the list of custodians for ESI searches) was timed such that, if it were granted, the deadlines in the Joint Discovery Plan, the trials, and the relocation of its pipeline would be substantially delayed. Indeed, Colonial has tied participation in future discovery to the outcome of this motion. The Airport has already spent significant sums defending and prosecuting these two cases. Having to bring new counsel up to speed would cause unnecessary delay and add significant and unwarranted expense. Any harm to Colonial (none has been identified) pales in comparison to that faced by the Airport.

Colonial has no evidence to support its claim that Waller has engaged in improper conduct or that the Airport or its counsel is trying (or has the ability based on imputed knowledge) to game

the system to gain an unfair advantage.  Under these facts and circumstances, the Airport should not be deprived of its choice of counsel.  *Moses v. Sterling Commerce (America), Inc.,* 122 Fed. Appx. 177, 183 (6th Cir. 2005) ("Courts must be vigilant in reviewing motions to disqualify counsel as the ability to deny one's opponent the services of capable counsel is a potent weapon that can be misused as a technique of harassment.") (internal citation and quotation omitted).

## VI.    Concluding Thoughts: Disqualification Would Send a Terrible Message

The Court does not need to reach the issues that might arise if there was anything of actual import in the file that Mr. Davidson had seen. As discussed in detail above, the current representation and the *de minimis* 2002 representation are not substantially related, and even if they were, there is no confidential information in the file that is material to the representation.  This is not a close case under Rule 1.10(b), and Waller should continue to be able to serve the Airport as its counsel in this case.

Nevertheless, it is worth concluding with a few comments about the entrapment aspect of this dispute.

At its core, this is a manufactured conflict designed to delay and harass. The Waller attorneys working on this case had no idea, until Colonial's counsel brought it up, that the "Airport Authority" representation had even occurred, which makes sense given that it was apparently an eight hour engagement that occurred 19 years ago.  No Waller attorney "had" the information in the "Airport Authority" file in any practical sense until Colonial raised this issue and started demanding files.   The "Airport Authority" file, a jumbled collection of documents, was buried in an offsite record location, with no one giving it a second thought.  That is, if Colonial had not thrust the conflict issue on to Waller in January 2021, all information related to the prior representation would have remained closed off in a dusty file, never seen, noticed, or cared about.

There is no reasonable position to the contrary, and it is inconceivable that those pushing Waller for documents reasonably believed that these ancient files were being employed strategically by Waller in this litigation.

In asking Waller to produce the files, Colonial set no parameters and never asked that the Airport Authority file not be reviewed by Waller lawyers evaluating the claim of conflict prior to sending. And, then, after Mr. Davidson, in consultation with Waller's General Counsel, conscientiously reviewed the file in order to determine (1) whether there was any merit to what Colonial's litigation counsel was claiming and (2) whether the material in the ancient file was actually what was being requested, Colonial claims that Mr. Davidson and the entire Waller firm is stained by his review to the point that the Airport should be denied its choice of counsel -- who has acted ethically in every way and who has always worked cooperatively with opposing counsel and the Court. Colonial's motion does not comport with the spirit of the Rules of Professional Conduct.

A "court should only disqualify an attorney when there is a reasonable possibility that some specifically identifiable impropriety actually occurred." *Boyle at *13*. No impropriety has occurred here.

## **CONCLUSION**

For all the reasons stated herein and in the contemporaneously filed Declaration and supporting materials, Colonial's Motion to Disqualify must be denied.

Respectfully submitted, this 9th of June, 2021.

*s/ Paul S. Davidson*
Paul S. Davidson (Tenn. BPR No. 011789)
Edward Callaway (Tenn. BPR No. 016016)
Michael C. Brett (Tenn. BPR No. 037290)
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 850-8942
Facsimile:  (615) 244-6804
paul.davidson@wallerlaw.com
ed.callaway@wallerlaw.com
mike.brett@wallerlaw.com

*Attorneys for Defendant*
*Metropolitan Nashville Airport Authority*

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties below as indicated on the electronic filing receipt. All other parties will be served by first class U.S. Mail. Parties may access this filing through the Court's electronic filing system.

L. Wearen Hughes
J. Andrew Goddard
Brian M. Dobbs
Bass, Berry & Sims PLC
150 3rd Ave. S., Suite 2800
Nashville, TN 37201
(615) 742-6200
whughes@bassberry.com
dgoddard@bassberry.com
bdobbs@bassberry.com

*Attorneys for Colonial Pipeline Company*

Gary C. Shockley
Caldwell G. Collins
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
211 Commerce St., Suite 800
Nashville, TN 37201
(615) 726-5600
gshockley@bakerdonelson.com
cacollins@bakerdonelson.com

*Attorneys for AECOM Technical Services, Inc.*

*s/ Paul S. Davidson*

4846-0779-3901