# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| **METROPOLITAN NASHVILLE** ) | |
| **AIRPORT AUTHORITY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.: 3:20-CV-00809** |
| **v.** ) | |
| ) | **Judge William L. Campbell, Jr.** |
| **COLONIAL PIPELINE COMPANY,** ) | **Magistrate Judge Alistair E. Newbern** |
| ) | **JURY DEMAND** |
| **Defendants.** ) | |

## FIRST AMENDED COMPLAINT

This is an action by Plaintiff Metropolitan Nashville Airport Authority (the "Airport" or "Plaintiff") for declaratory judgment, breach of contract, and specific enforcement of an easement agreement (the "Easement") that requires Defendant Colonial Pipeline Company ("Colonial" or "Defendant") to relocate its liquid petroleum products pipeline to make way for the Airport's continuing renovation and expansion program, "BNA Vision". Plaintiff also seeks compensatory and punitive damages and an award of attorneys' fees as a result of Colonial's intentional, reckless and vexatious breach of the Easement and its vexatious conduct during the course of this litigation.

Traffic congestion at the Airport is already noticeable at peak times. Without improvements that require relocation of Colonial's easements/pipelines, the result will be significant back-ups by 2023 and gridlock by 2028. In order to meet construction schedules and avoid undue delay, the Airport informed Colonial that the pipelines must be moved by mid-2021. Although Colonial acknowledged its obligation in 2018, it has refused to honor its agreement to move the pipeline on schedule and is engaged in a hold up of the relocation in an attempt to

extract unwarranted concessions from both the Tennessee Department of Transportation ("TDOT") and the Airport. Colonial's breach of the Easement has caused material and irreparable project delays. By this action, the Airport, for itself and in the public interest, seeks a speedy award of specific performance mandating Colonial to move its pipelines and easement on a definitive schedule, compensatory and punitive damages, an award of attorneys' fees, and such other and further relief as this Court deems just, proper and equitable.

## PARTIES, JURISDICTION, AND VENUE

1.      The Airport is a Tennessee governmental entity with its principal place of business at One Terminal Drive Suite 501, Nashville, TN 37214. With nearly 18.3 million passengers in 2019, the Airport has been one of the fastest growing airports in North America.

2.      Colonial is a privately held Delaware and Virginia corporation authorized to conduct business in Tennessee, with its principal place of business at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 30009. Colonial is an energy company that claims to manage the largest refined products pipeline in the United States. Pursuant to the Easement, Colonial transports liquid petroleum products through two pipelines that cross Airport property in Davidson County.

3.      This Court has personal jurisdiction over Colonial because it regularly conducts business in Tennessee and has established sufficient minimum contacts with this state. In addition, a substantial part of the events or omissions giving rise to the claims in this matter occurred in Tennessee and  this  action relates to and arises out of the Easement.

4.      This Court has subject matter jurisdiction over this action because this action is between citizens of different states and the amount in controversy exceeds $75,000, excluding interest and cost.

5.     Venue is proper under 28 U.S.C § 1391 because a substantial part of the events, acts, and omissions giving rise to the claims involved in this matter occurred in this judicial district.  This cause of action seeks a declaration of the rights and obligations of the parties under the  Easement and seeks to specifically enforce the performance of that agreement in Davidson County, Tennessee.

## FACTS

6.     The Airport and Colonial entered into the Easement on May 14, 1976.   A true and correct copy of the Easement is attached as **Exhibit 1**.

7.     The Easement grants Colonial the right to "construct, operate, maintain, repair, replace and inspect its liquid petroleum products pipeline" on real property in Davidson County, Tennessee, owned by the Airport.  *See* Exhibit 1 at Page 3.

8.     The Easement also provides that "Colonial will relocate its easements, either those existing on property now owned or hereafter acquired by the Metropolitan Nashville Airport Authority, at its sole cost and expense upon notification by the Metropolitan Nashville Airport Authority that its lines interfere with the expansion, development, and/or construction undertaken or to be undertaken by the Metropolitan Nashville Airport Authority, its successors, assigns, agents, or employees." *See* Exhibit 1 at Page 6.

9.     Middle Tennessee has seen an explosion of economic and population growth in recent years. Since at least 2003, the Airport has planned an expansion of its facilities to accommodate the increase in air traffic and passengers traveling through the region. Such an expansion necessarily requires realignment of portions of Donelson Pike and improvements to terminal access roadways in order to address traffic congestion and open up space for the

3

Airport's facilities and roadways (the "Terminal Access Roadway Improvement Project" or "TARI Project").

10.     In furtherance of its expansion plans, the Airport requested that the Tennessee Department of Transportation ("TDOT") agree to realign Donelson Pike (the "Highway Project"). TDOT agreed to undertake the Highway Project, which was designed to tie into the Airport's planned terminal access roadway system, as an accommodation to the Airport. TDOT and the Airport agreed that both the Highway Project and the TARI Project would proceed concurrently and they agreed to work together to develop a mutually beneficial phasing plan that maintains adequate access to airport facilities at all times. A true and correct copy of the Memorandum of Understanding entered into between the Airport and TDOT on November 16, 2018 is attached hereto as **Exhibit 2**.

11.     The Airport and TDOT identified that the Highway Project and the TARI Project conflicted with the existing location of the liquid petroleum products pipelines operated by Colonial pursuant to the Easement. In 2018, the Airport notified Colonial that its pipelines interfered with the TARI Project and would have to be moved. Throughout 2018 and 2019 Colonial and the Airport met to address engineering issues related to relocation of Colonial's pipeline to accommodate the Airport's expansion plans.

12.     On July 5, 2018, Colonial's Relocation Project Manager Dan Jacobsen met with Airport project managers to discuss engineering issues tied to the relocation. Mr. Jacobsen indicated that Colonial preferred one relocation option that would resolve all conflicts with the TARI Project and the Highway Project. He acknowledged Colonial's obligation to pay for the relocation, stating Colonial's Easement with the Airport was "not advantageous" for Colonial, because it legally obligated Colonial to move the pipelines at Colonial's own expense.

4

13.     On September 7, 2018, Airport project managers met again with Mr. Jacobsen and other members of the Colonial pipeline engineering staff to discuss three (3) proposed relocation alignments. Mr. Jacobsen represented that Colonial preferred Option 1A, which would relocate Colonial's lines to a new alignment parallel to I-40.  A true and correct copy of Colonial's preferred Option 1A is attached as **Exhibit 3.**

14.     By November 2018, Colonial was on notice that TDOT would only reimburse Colonial for engineering and construction costs associated with those portions of the Option 1A relocation plan that fell directly within TDOT's right of way.  Because Colonial knew that the entire pipeline relocation was not fully reimbursable by TDOT, Mr. Jacobsen informed the Airport that Colonial's budget for the relocation would be subject to review and approval of Colonial's management. He estimated that the approval process and the engineering and construction associated with the relocation would require up to 18 months.

15.     In January 2019, at Colonial's request, its engineering firm for pipeline relocation projects, Kleinfelder, Inc. ("Kleinfelder"), reviewed Colonial's right of way files pertaining to the Airport to provide an opinion with respect to Colonial's relocation cost reimbursement rights against the Airport. Kleinfelder responded to Colonial's request by email on January 28, 2019:

████████████████████████████████████████████████

██████████████████████████████ Kleinfelder further informed Colonial: ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

16.     By February 2019, both Colonial and Kleinfelder had determined that the cost of relocation would not be reimbursable by the Airport and that among the various options for relocation on the Airport's property, Option 1A a/k/a the "Long Route" was selected as the option to advance to the next stage of review and engineering design. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

17.     In February 2019, Colonial and the Airport discussed the timeline for the relocation. Colonial was informed that the pipeline relocation should be completed by the end of 2020 so that the TARI project could remain on schedule.

18.     In April 2019, TDOT was conducting borings on the Airport's property in connection with its separate Highway Project to redesign the interchange on Interstate 40 at the Airport.  It utilized the Tennessee 811 One Call System ("call before you dig") whereby Colonial was notified and asked to mark its pipelines. Colonial responded affirmatively to TDOT that it had marked its lines, when in reality it had not done so in the area where TDOT struck Colonial's line on April 9, 2019. The line strike is the subject of a separate suit: 3:20-cv-00666. The line strike did not impact Colonial's preferred relocation option, the Long Route.

19.     On May 24, 2019, Airport project managers met again with Mr. Jacobsen, as well as Colonial District Manager Perry Sisk and Colonial Project Manager Igor Rodrigues, along with two employees of Colonial's design consultant Kleinfelder. The group discussed relocation plans and mitigation of conflicts.  Colonial confirmed that relocating the pipeline using Option

6

1A, the area along the south side of I-40, was Colonial's most favorable solution. The timeline for relocating the pipeline was again discussed. At that time, Colonial represented that its intention was to have all the relocation/removal work done by mid-2021.

20.    By August 2019, Colonial's relocation management team had recommended and approved spending $450,000 for detailed engineering and design work to advance relocation along the Long Route: "The team recommends approval of $450,000 to proceed to the Define Stage, which includes detailed engineering, bidding and project planning for the Execute Stage for the Selected Option 1 [the Long Route]."

21.    The Colonial team noted the benefits of the Long Route as follows: "The benefit of this project is to avoid conflicts caused by the TDOT I-40/Donelson Pike Interchange and MNAA expansion project. It is understood that there is strong likelihood that MNAA will continue to expand its facilities in the future. This project will relocate the pipelines in such way as to minimize the risk of the line strikes to the pipelines during expansion-construction and the potential for future relocation/accommodation projects due to airport expansions."

22.    In approving funds to proceed with the Long Route, Colonial's management team also noted in August 2019 that: "Accommodation costs to encroacher's impacts (MNAA/DOT) will not be reimbursable." The Colonial team selecting to go forward with the Long Route made no mention of the line strike or any impact of the line strike on relocation options.

23.    The anticipated schedule for the relocation project called for the "define" stage (all engineering and design work) to be complete by May 2020 and for the "execute" stage (constructing the project) to be complete by September 2020.

24.     On August 19, 2019, Mr. Jacobsen sent an email to Airport personnel indicating that: "On August 8th, I presented this relocation project to upper management and received approval to move into the next stage of engineering." He asked that the Airport confirm that it was in agreement with the Option 1A routing of the relocation. The Airport responded that it was in agreement with Option 1A. Between August and November 2019, Colonial project managers and the Airport worked together to move the relocation project forward. A true and correct copy of the September 19, 2019 email from Jim Morinec summarizing the technical aspects of the relocation agreed upon by the Airport, Colonial, and Kleinfelder is attached hereto as **Exhibit 4.**

25.     During the course of the deposition of Colonial's former Managing Director of Commercial Affairs Jim Avioli taken on October 7, 2021, the Airport learned that Colonial's Commercial Affairs Group commandeered the project just as it was set to commence. Colonial's Commercial Affairs Group did so with the objective of sabotaging any advancement of engineering, design or construction of the pipeline relocation, so that Colonial could create leverage against the Airport and TDOT ███████████████████████████████ and contract concessions.

26.     In Mr. Avioli's words, the cost of relocation was "on Colonial's dime." Accordingly, Mr. Avioli set the Commercial Affairs Group in motion in August 2019, knowing that Colonial did not have reimbursement rights for projects dictated by the Airport.

27.     Colonial's Commercial Affairs Group proceeded to consider various options to secure reimbursement for costs it was not entitled to, including: stopping service altogether to the Airport and to Nashville; relocating only the gasoline line (leaving the Airport without needed fuel for the airlines); and ███████████████████████.

28. On August 5, 2019, Mr. Avioli sent an email to members of his group stating:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

29. Colonial has a pattern and practice of trying to create leverage ████████████████ ████████████ where public projects call for Colonial to relocate its pipelines "on its own dime."

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

30. In furtherance of its plan to shake down the Airport, the Commercial Affairs Group considered holding up other unrelated agreements with the Airport in order to secure better relocation rights at the Airport. In an email dated September 13, 2018, Aaron Smith, who worked for Mr. Avioli in the Commercial Affairs Group wrote: ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

31. By October 30, 2019, Mr. Avioli formed a two person "Steering Team" consisting of himself and Meg Blackwood, a Colonial in-house attorney. From that point forward, Colonial effectively shielded all inquiry into the work of the "Steering Team" from discovery under the

9

cloak of attorney client privilege. Nonetheless, some of the direction given by the Steering Team can be seen in Colonial and Kleinfelder emails.

32.     On October 29, 2019, for example, Mr. Smith wrote: ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

33.     By December 2019, Colonial's Steering Team made the decision to shift gears and approach TDOT with the argument that TDOT was 100% responsible for the cost of the relocation project, even for the part Colonial knew was dictated by the Airport's expansion project. On December 9, 2019, Mr. Avioli wrote TDOT falsely stating that there was no legal deadline to submit Colonial's application for reimbursement for TDOT's Highway Project portion and that the project would not progress until an agreement was reached on funding.

34.     On December 13, 2019, representatives of Colonial's Project Management Team, its Commercial Affairs and Legal Departments met with TDOT and took the position that the Airport's TARI project was a "direction action" resulting from TDOT's Highway Project, and insisted that TDOT was responsible to pay 100% of the pipeline relocation costs (which Colonial estimated to be approximately $30 Million). Colonial also represented that its Board had not approved the pipeline relocation; and that Board approval, if ultimately granted, was expected to take 6-12 months. TDOT denied the pipeline relocation was 100% reimbursable, and again made it clear that the Highway Project was being done as an accommodation to the TARI Project, not part of a TDOT initiative to maintain roadway functionality.

35.     Having been told by TDOT that an application seeking 100% reimbursement would be rejected, Colonial nonetheless proceeded to submit an application seeking just that. On December 19, 2019, just a few days after the TDOT meeting, Colonial submitted its "A-Date" package to TDOT. The A-Date submittal claimed TDOT was 100% responsible to pay for the relocation of its pipelines on the Airport's property. The A-Date submittal also falsely stated to TDOT that, due to the April 9, 2019 line strike, Colonial's expenses would be millions of dollars higher because: "Originally Colonial was favoring the MNNA Option 3 route for relocation…. However, due to TDOTs strike of Colonial's line 19 in April 2019 that route is no longer possible." Colonial's statement that it had originally favored MNAA Option 3 (or any option other than the Long Route) was a knowingly false statement. As Colonial surely expected, TDOT quickly rejected Colonial's A-Date submission the following month. A true and correct copy of TDOT's January 23, 2020 rejection of Colonial's A-Date Package is attached as **Exhibit 5.**

36.     After Colonial's attempt to shift 100% of its contractual obligation to pay for the pipeline relocation to TDOT was rejected by TDOT, Colonial's Commercial Affairs Group, led by the Steering Team of Jim Avioli and Colonial's in-house lawyer, cancelled critical meetings its engineers had scheduled with the Airport and stopped all work. As a result, Mr. Avioli was specifically warned by Colonial's Relocation Project Manager that stopping all work would throw the project further off schedule. In addition to these stop work orders, in February 2020, Commercial Affairs directed that two new project milestones be inserted into the project schedule: ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

37.     Although Mr. Jacobsen had indicated in December 2019 that he had planned to hold meetings with the Airport in the following three to eight (3-8) weeks on right of way, easement, environmental, permitting, and design considerations, he subsequently informed the Airport that he was required to obtain authorization from Colonial's Legal Department to even schedule such meetings. The meetings were never scheduled.  Mr. Jacobsen's employment with Colonial was terminated in March 2020.

38.     In March 2020, in its continuing effort to get the relocation project on track, the Airport sent formal written notice to Colonial (the "Notice") that because the current location of Colonial's easements interfered with the Airport's plans for expansion and related construction, Colonial was obligated to relocate its easements at its sole cost and expense.   The Airport reminded Colonial that time was of the essence. A true and correct copy of the Notice is attached as **Exhibit 6**.

39.     On April 8, 2019, Colonial's Assistant General Counsel sent a letter in response to the Airport's Notice (the "Response") which failed to substantively respond to the Airport's request that Colonial relocate its pipeline. A true and correct copy of the Response is attached as **Exhibit 7**. Specifically, the Response states:

> *The relocation of Colonial's pipelines is a complex, multi-million dollar project that takes a great deal of coordination and planning, particularly when (as is the case here) the relocation is done at the request of a third-party and not because of Colonial's own operational needs . . . It is not cost effective or desirable for Colonial to do separate pipeline relocation projects to address the TDOT and MNAA projects.  Accordingly, Colonial has been in discussions with TDOT and MNAA for some time about Colonial's proposed plan to do a single project, relocating both pipelines in a manner that would address all conflicts with the TDOT project and the MNAA project.  In fact,*

*representatives from MNAA and Colonial have had several meetings since 2018 (both in Alpharetta and Nashville) to discuss various technical aspects of the relocation, including the proposed route of the relocation. Colonial trusts that MNAA will continue to work with TDOT and us on that effort.*

40.     On or about April 17, 2020, Mr. Avioli used the pandemic as yet another excuse to stop all work on the Airport project. Colonial's Relocation Project Manager immediately responded to Mr. Avioli that this was not necessary: ████████████████████

████████████████████████████████████████

████████████████████████      ████████████████████  ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

41.     Colonial did not submit a revised A-Date Package to TDOT until May 21, 2020. While the revised A-Date Package no longer insisted that TDOT pay 100% of the engineering and construction costs, it did continue to advance the false claim that TDOT was responsible to pay in excess of $12 Million of those costs because Colonial was forced to choose a more expensive relocation route in order to avoid soil remediation costs resulting from a pipeline spill that occurred on the Airport's property in April 2019. This is not true, as the route Colonial includes in its revised A-Date package is essentially the same as the Option 1A route it chose before the spill took place.

42.     TDOT again rejected Colonial's proposal, this time on the grounds that Colonial was requesting that TDOT pay for "betterment." That is, Colonial was asking TDOT to pay for

13

upgrades to the design of the pipeline intended to improve the long term maintenance and longevity of the pipeline. Colonial was again instructed to re-submit a revised A-Date Package that represented only the engineering and construction costs for those parts of the relocation that fell directly within TDOT's right of way. A true and correct copy of TDOT's July 16, 2020, rejection of Colonial's revised A-Date Package is attached as **Exhibit 8.**

43. On June 29, 2020, the Airport requested that Colonial provide: "A clear and concise statement of Colonial's position regarding movement of the pipeline, including a current statement of its plans, anticipated timing and expense and identification of issues or impediments it believes need to be resolved." Colonial failed to respond to this request.

44. The Airport subsequently arranged an August 13, 2020 meeting of business, operational, and legal representatives of the Airport, TDOT, and Colonial to identify and discuss any outstanding issues relating to the pipeline relocation. The day before the meeting was to begin, and with prior knowledge of TDOT's participation, Colonial informed the Airport that it refused to attend the meeting if both TDOT and the Airport were present. The Airport asked Colonial to reconsider. Colonial responded to this request by saying it would be willing to attend, but that it disagreed with the Airport's proposed agenda and would not discuss issues it deemed unique to the Airport or TDOT in the presence of the other. Colonial has not identified any issues related to the pipeline relocation that are so unique to the Airport that they may not be discussed in TDOT's presence. A true and correct copy of the email chain setting forth the proposed attendees and agenda for the meeting is attached as **Exhibit 9.**

45. Between April 2020 and April 2021, Colonial's communications with TDOT continued to drag on with no agreement reached. In Colonial's last letter to TDOT, dated April 8, 2021, Colonial gave lip service to the possibility of reaching agreement to a percentage

14

reimbursement level from TDOT, but then raised the same litany of objections to moving forward it had raised in the past, including that no funding or timing agreement had been reached with the Airport. Colonial's April 8, 2021 letter concluded that it could not reach an agreement with TDOT; it could not give TDOT the necessary "days to complete" the project; and, in fact, it could not move forward at all until "a global resolution" is reached among all parties. A true and correct copy of Colonial's April 8, 2021 letter to TDOT is attached as **Exhibit 10.**

46. Through depositions taken of Colonial's project managers, the former Managing Director of its Commercial Affairs Group, and its engineering firm, Kleinfelder, it is clear that Colonial's stop work orders related to the relocation of its pipelines on the Airport's property have never been lifted (and won't be) because neither the finish/finish funding nor the Legal Hold Release milestones have been reached. In order to perpetuate its attempt to extort the Airport, Colonial has intentionally derailed discussions with TDOT; it has not done the engineering and design work that was approved in August 2019 and scheduled to be complete by May 2020; and it has knowingly and intentionally caused the project to be materially delayed.

47. Colonial's prevarications and delays have now stretched over two years. Colonial has intentionally, recklessly and in bad faith breached its obligation under the Easement to relocate the pipelines and easement at its own expense. If Colonial is not ordered by this Court to move the pipelines and easement on a definitive schedule, the Airport's planned expansion will be further significantly disrupted and delayed.

48. Colonial has intentionally, recklessly and vexatiously delayed the relocation of its pipelines and easement on the Airport's property in an effort to avoid the expenses associated therewith, for which it is obligated under the Easement.

49.     Colonial's refusal to fulfill its contractual obligation to the Airport has caused unnecessary delay to the TARI project and the Highway Project and has resulted in consequential damages to the Airport.

## CAUSES OF ACTION

## COUNT ONE: DECLARATORY JUDGMENT

50.     The Airport incorporates the foregoing numbered paragraphs above as if fully set forth herein.

51.     The Easement states in relevant part that "Colonial will relocate its easements, either those existing on property now owned or hereafter acquired by the Metropolitan Nashville Airport Authority, at its sole cost and expense upon notification by the Metropolitan Nashville Airport Authority that its lines interfere with the expansion, development, and/or construction undertaken or to be undertaken by the Metropolitan Nashville Airport Authority, its successors, assigns, agents, or employees."

52.     Colonial's pipeline easement interferes with the expansion, development, and/or construction currently being undertaken by the Airport, its successors, assigns, agents, or employees.  The Airport provided notification of the need to relocate the pipelines and easement to Colonial in 2018. Nevertheless, Colonial has failed to relocate the pipelines and easement in accordance with the Easement.

53.     Pursuant to 28 U.S.C. §2201, the Airport seeks the declaratory judgment of this Court that it is Colonial's obligation to relocate its pipelines and easement at its sole cost and expense pursuant to the express contractual terms of the Easement and that any dispute it may have related to the line strike that occurred on April 9, 2019 or any dispute with TDOT regarding the sharing of costs for those portions of the relocation project that may fall within TDOT's right

16

of way are not grounds for Colonial's continued intentional, reckless and vexatious delay and breach of its agreement with the Airport.

## COUNT TWO: BREACH OF CONTRACT

54.    The Airport incorporates the foregoing numbered paragraphs above as if fully set forth herein.

55.    An enforceable contract exists between the Airport and Colonial. The Easement states in relevant part that "Colonial will relocate its easements, either those existing on property now owned or hereafter acquired by the Metropolitan Nashville Airport Authority, at its sole cost and expense upon notification by the Metropolitan Nashville Airport Authority that its lines interfere with the expansion, development, and/or construction undertaken or to be undertaken by the Metropolitan Nashville Airport Authority, its successors, assigns, agents, or employees."

56.    Colonial's nonperformance under the Easement amounts to a knowing, intentional, reckless, vexatious and material breach of contract. Colonial is aware of, and has consciously disregarded, the facts that its pipeline easement interferes with the expansion, development, and/or construction currently being undertaken by the Airport, its successors, assigns, agents, or employees.  The Airport provided notification to Colonial in 2018 and again in March 2020 of the need to relocate the pipelines and easement. Nevertheless, Colonial has egregiously failed to take the steps necessary to relocate the pipelines and easement in accordance with the Easement in furtherance of its continuing effort to shake down the Airport for reimbursement dollars and contract concessions.

57.    The Airport has suffered and continues to suffer damages as a result of Colonial's material breach of contract. Colonial's intentional impediment of steps necessary for the relocation of its pipelines and easement in accordance with its obligation under the Easement has

proximately caused significant delays to the BNA Vision renovation and expansion program and damages to the Airport, including, but not limited to, lost (expected) profits, lost revenues, higher construction costs due to delay, and other direct and indirect consequential damages, all of which will only grow worse over time.

## COUNT THREE:

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

58.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 57 above as if fully set forth herein.

59.     The Easement, like every contract, contains an implied covenant of good faith and fair dealing, which required the Parties to act with good faith and in a commercially reasonable manner with respect to the Easement.

60.     Colonial, in failing to fulfill its obligations under the Easement, and in intentionally and needlessly delaying the relocation of its pipelines and easement, has acted in bad faith and in an unreasonable manner with respect to the Easement.

61.     Colonial has, therefore, breached its implied duty of good faith and fair dealing by failing to act in good faith and in a commercially reasonable manner with respect to the Easement.

62.     Colonial's breach of the implied duty of good faith and fair dealing has proximately caused damages to the Airport, including, but not limited to, lost (expected) profits, lost revenues, and other direct and indirect consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE**, premises considered, Plaintiff Metropolitan Nashville Airport Authority respectfully requests that the Court:

a) grant a speedy hearing of this action and advance it on the calendar as provided by Fed. R. Civ. P. 57;

b) enter a judgment declaring that Colonial is responsible for (1) relocating its liquid petroleum products pipeline and (2) the costs and expenses associated with relocating Colonial's easement for a liquid petroleum products pipeline on real property owned by the Airport in Davidson County, Tennessee;

c) enter a judgment setting a definitive schedule for Colonial to relocate the pipeline so as to avoid additional project delays and requiring Colonial to adhere to that schedule;

d) enter a judgment finding that Colonial has materially breached the Easement by impeding the relocation of its pipelines on the Airport's property;

e) enter a judgment finding that Colonial intentionally, recklessly and vexatiously breached the Easement and the implied duty of good faith and fair dealing in its intentional, unnecessary delay of this project;

f) enter a judgment awarding the Airport compensatory and punitive damages in an amount to be proven at trial; consequential damages, including, but not limited to, lost (expected) profits, lost revenues and other direct and indirect consequential damages in an amount to be proven at trial and pre- and post-judgment interest;

g) enter a judgment awarding to the Airport its reasonable attorneys' fees and expenses incurred as a result of Colonial's breach of its contractual obligations; and

h) grant such other and further relief as this Court deems just, proper and equitable.

Pursuant to Fed. R. Civ. P. 38 and 39, Plaintiff Metropolitan Nashville Airport Authority demands a jury trial on all issues so triable.

Respectfully submitted,

*s/ Paul S. Davidson*
Paul S. Davidson (TN BPR # 011789)
Michael C. Brett (TN BPR # 037290)
Danielle N. Johns (TN BPR # 036064)
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile (615) 244-6804
Paul.Davidson@wallerlaw.com
Mike.Brett@wallerlaw.com
Danielle.Johns@wallerlaw.com

*Counsel for Plaintiff Metropolitan Nashville Airport Authority*

# EXHIBIT 1

$^{1}(F^{\circ} \ldots \ell \ell \ell$
This cument prepared
Che   E. Griffith,
GRIFFITH AND STOKES

## Dedication of Easement and Agreement

For and in consideration of the payment of thir
five thousand dollars ($35,000.00) cash in hand paid and
mutual benefits that will accrue by reason of the hereina
described improvements and for the additional considerati
hereinafter set out, the undersigned do hereby grant, bar
sell, transfer and convey unto Colonial Pipeline Company
its successors and assigns, a permanent easement describe
follows:

All those certain strips of land situated in the 3rd, for
the 2nd Civil District, Davidson County, Tennessee; said
being 50 feet in width and lying 25 feet either side of t
following described centerlines:

> Beginning at a point, said point being N 32° 40' W,
> 33 feet more or less, from the northerly Right-Of-
> Way line of Murray Lane; said point of beginning
> being 10 feet more or less, easterly as measured at
> right angles, from Colonial Pipeline Company's
> existing line;

> Thence through the lands of the Grantors along a lir
> 10 feet more or less, easterly from and parallel to
> pipeline for the following seven courses and distanc
> N 32° 40' W, 2072 feet; N 69° 51' W, 563 feet; N 87°
> 47' W, 46 feet; S 76° 59' W, 604 feet; N 85° 30' W,
> S 82° 48' W, 152 feet; N 89° 22' W, 122 feet;

> Thence crossing Colonial Pipeline Company's existing
> pipeline S 65° 54' W, 69 feet to a point; said point
> being 20 feet more or less, southerly, as measured
> at right angles, from Colonial Pipeline Company's
> existing pipeline;

> Thence continuing through the lands of the grantors
> along a line 20 feet more or less, southerly from
> and parallel to said pipeline the following 2 course
> and distances: S 87° 36' W, 21 feet; S 89° 03' W, !
> feet more or less, to a point of exit, said point o:
> exit being in the easterly Right-Of-Way line of
> Donelson Pike, 20 feet more or less, southerly as
> measured along said Right-Of-Way line of Donelson
> Pike from Colonial Pipeline Company's existing pipe.
> line;

> Thence continuing across said Donelson Pike, S 89°
> 03' W, 89 feet more or less. to a point of re-entry
> to grantor's land, said point of re-entry being in
> the westerly Right-Of-Way line of Donelson Pike, 56
> feet more or less, southerly, as measured along sai
> Right-Of-Way line of Donelson Pike from a fence
> corner of grantor's land;

Thenc through the lands of said ⸍rantors, along a
line 20 feet more or less, southerly from and par-
allel to said Colonial Pipeline Company's existing
pipeline for the following 24 courses and distance:
S 89° 03' W, 37 feet more or less; N 84° 10' W, 28.
feet; S 84° 02'. W, 306 feet; S 60° 05' W 236 feet;
S 70° 52' W, 125 feet; N 88° 58' W, 236 feet; N 78
54' W, 177 feet; N 64° 03' W, 102 feet; N 04° 42' ;
558 feet; N 37° 29' W, 139 feet; N 07° 42' E, 586
feet; N 69° 55' W, 891 feet; N 85° 03' W, 1035 fee
N 79° 42' W, 235 feet; N 89° 28' W, 69 feet; S 55°
17' W, 89 feet, N 81° 55' W, 331 feet; N 79° 09' W
162 feet; N 72° 40' W, 318 feet; N 79° 19' W, 361
feet; N 86° 58' W, 118 feet; N 79° 42' W, 335 feet
S 76° 01' W, 48 feet; S 06° 49' W, 337 feet;

Thence continuing along a line 5 feet more or less
southerly from and parallel to said pipeline S 57°
15' W, 68 feet more or less, to a point of exit.
Said point being in the easterly Right-Of-Way line
of McGavock Pike, said point of exit being 6 feet,
more or less, southerly, as measured along said Ri
Of-Way line of McGavock Pike from Colonial Pipelin
Company's existing pipeline;

Thence continuing across said McGavock Pike, S 57°
15' W, 87 feet, more or less, to a point of re-ent
to grantors land said point of re-entry being on t
westerly Right-Of-Way line of McGavock Pike, said
point of entry being 11 feet, more or less, southe
as measured along said Right-Of-Way line of McGavo
Pike from fence corner, being the intersection of
southerly Right-Of-Way line of Dabbs Avenue with t
westerly Right-Of-Way line of McGavock Pike;

Thence continuing along said line 5 feet, more or
southerly from and parallel to said existing pipel
S 57° 15' W, 71 feet, more or less, to a point, sa
point being 20 feet, more or less, southerly as me
at right angles from Colonial Pipeline Company's
existing pipeline;

Thence continuing through the lands of the Grantor
along a line 20 feet, more or less, southerly from
and parallel to said existing pipeline for the fol
seven courses and distances; N 84° 39' W, 486 feet
N 82° 57' W, 582 feet; S 74° 14' W, 700 feet; S 74
W, 647 feet; S 73° 05' W, 168 feet; S 75° 15' W, 5
feet; N 59° 59' W, 71 feet, more or less, to a poi
of exit, said point of exit being in the southerly
Right-Of-Way line of Dabbs Avenue, 28 feet more or
westerly, as measured along said Right-Of-Way line
Dabbs Avenue from Colonial Pipeline Company's exis
pipeline;

Thence continuing across said Dabbs Avenue, N 59°
W, 100 feet, more or less, to a point of re-entry
Grantors land, said point of re-entry being on the
northerly Right-Of-Way line of Dabbs Avenue, said
point of entry being 28 feet more or less, westerl
as measured along said Right-Of-Way line of Dabbs
Avenue from Colonial Pipeline Company's existing p
line;

Thence cont. .uing along a line 20 feet, ...ore or less,
southerly from and parallel to said pipeline the followir
two courses and distances: N 59° 59' W, 892 feet, more
or less; N 14° 59' W, 14 feet;

Thence continuing through the lands of the Grantors,
along a line 10 feet, more or less, southerly from
and parallel to said Colonial Pipeline Company's existing
pipeline, N 59° 59' W 87 feet, more or less, to a
point of exit on the westerly property line of said
Grantors; said property line being the easterly Right-
Of-Way line of Briley Parkway, being 9 feet, more or
less, southerly as measured along said Right-Of-Way
line from a fence corner post of said Grantors land.

In addition, Colonial is hereby granted a temporary
construction easement thirty (30) feet wide and located
on the north side of the above easement from Murray Lane
running in a north and westerly direction until the ease-
ment crosses an existing pipeline, approximately 203
feet east of Donelson Pike. Thence, said construction ea
ment will extend on the southerly side of said permanent
easement except as otherwise shown on the attached Exhib:
"A". Said easement shall lapse upon completion of const:

Colonial recognizes that certain portions of the ea:
ment granted hereunder encroaches upon existing T.V.A. and ot!
public utility easements and assumes responsibility for coord
its construction with the holders of such existing easements .
warrants that it will receive permission for such encroachmen
and agrees to hold Authority harmless for failure to receive

This conveyance includes the right of Colonial Pipe
Company, its servants and agents to construct, operate, maint
repair, replace and inspect its liquid petroleum products pip
line within the limits of the aforedescribed easement or righ
of-way.

To have and to hold said easement or right-of-way t
Colonial Pipeline Company, its successors and assigns forever
do hereby covenant with said Colonial Pipeline Company that w
are lawfully seized and possessed of said land in fee simple
have a good right to make this conveyance.

Colonial Pipeline Company hereby covenants that upo
completion of construction it will restore the hereinabove de
cribed property to its original condition, or as near theretc
is reasonably possible. The Metropolitan Nashville Airport d
not waive any claim for damage in any manner for the negligen
of any agent, representative or contractor for Colonial Pipel
Company during the construction of any of the aforesaid imprc

As further consideration for the granting of
easement, Colonial Pipeline Company agrees to the foll

(1)  Colonial Pipeline agrees to defend and
the Metropolitan Nashville Airport Authority free and
from loss from each and every claim and demand of what
nature, made on behalf of or by any person or persons,
act or omission on the part of Colonial, its agents, s
employees, suppliers, constructors or tenants.  It is
tention that Colonial shall, at all times, and under a
cumstances, hold the Metropolitan Nashville Airport Au
free and harmless from any damages or judgments result
aforesaid, by reason of any accident or injury to pers
property occurring on the premises or improvements the
on any other property now owned cr subsequently purcha
Metropolitan Nashville Airport Authority and on which (
has located any facilities, except such as may be caus
Metropolitan Nashville Airport Authority, its agents, :
or employees.

In addition to the above, Colonial agrees to
to the Metropolitan Nashville Airport Authority, upon
execution of this Agreement, certificates of a continu
lic liability and property damage insurance policy sat
to the Metropolitan Nashville Airport Authority, indem
and holding the Metropolitan Nashville Airport Authori
its Board of Commissioners harmless against any and al
arising out of the construction and subsequent use of
demised premises, including all of its facilities now
on property owned by the Metropolitan Nashville Airpor
Authority.  Colonial further agrees to add to the poli
easements located on property as such is subsequently :
by the Metropolitan Nashville Airport Authority.  Such
shall be in the minimum amount of not less than five h

thousand do    rs ($500,000.00) for eac.  erson, limited
to one million dollars ($1,000,000.00) for each occurren
of personal injuries and five hundred thousand dollars
($500,000.00) for property damage.  Colonial shall keep
the same in force so long as Colonial uses any easements
on Airport Authority property.

If Colonial shall at any time fail to insure c
keep insured as aforesaid, the Metropolitan Nashville
Airport Authority may do all things necessary to effect
maintain such insurance, and all monies expended by it
for that purpose shall be repayable by Colonial, in the
the premium or premiums are paid by the Metropolitan Nas
Airport Authority.

(2)  All construction will be completed accord
to the requirements of existing codes and regulations of
the Metropolitan Government of Nashville and Davidson Co
Tennessee and in compliance with Part 77 of the Federal
Aviation Regulations.  The plans and specifications for
construction and all subsequent construction must first
approved by the Metropolitan Nashville Airport Authority
which approval shall be evidenced by a letter to Colonia
from Metropolitan Nashville Airport Authority's Executiv
Director.  Failure to reach agreement on plans and speci
shall cause an immediate termination of this Agreement
and Easement.  Colonial shall execute and deliver to the
politan Nashville Airport Authority within thirty (30) d
from the date hereof, and prior to construction, a bond
form and with one or more sureties satisfactory to the M
politan Nashville Airport Authority against all mechanic
and other liens which may arise or be created in the con
of its improvements, and providing further that when com
the said improvements and premises shall be free from an
all liens Colonial will secure all necessary permits, an

-5-

( (
licenses from any governmental authority including any
right or license needed to cross and/or tunnel public street
right-of-ways.

(3) Colonial will relocate its easements, either
those existing on property now owned or hereafter acquired
by the Metropolitan Nashville Airport Authority, at its sole
cost and expense upon notification by the Metropolitan Nashville
Airport Authority that its lines interfere with the expansion,
development, and/or construction undertaken or to be under-
taken by the Metropolitan Nashville Airport Authority, its
successors, assigns, agents, or employees.

(4) Colonial agrees to operate in such a way
as to fully protect the Airport and its environs from any
environmental pollution either through the air or water.
Colonial further agrees to operate in accordance with Metro-
politan Ordinance No. 68-554, entitled "An Ordinance Amending
the Metropolitan Code, Chapter 4, Subchapter a, by Providing
for Air Pollution Control Within the Metropolitan Government
Area." Colonial further agrees to abide by all rules and
regulations and administrative orders issued by the State
Stream Pollution Control Board or other State agency res-
ponsible for regulating environmental pollution. Colonial
further agrees to obey all rules, regulations and orders
relating to environmental pollution promulgated by the
Federal Government, and specifically those promulgated
under Public Law 91-258, 91st Congress, entitled: "Airport
and Airway Development Act of 1970."

(5) Colonial, for itself, its successors
in interest, and grantees, as part of the consideration hereof,
does hereby covenant and agree, as a covenant running with
the land, that in the event facilities are constructed,
maintained, or otherwise operated on the said property descr-
in these easements, for a purpose for which a Department of

(                                    (

Transportation program or activity is extended or for an
purpose involving the provision of similar services or b
it shall maintain and operate such facilities and servic
in compliance with all requirements imposed pursuant to
Title 49, Code of Federal Regulations, Department of
Transportation, Subtitle A, Office of the Secretary, Par
21, Nondiscrimination in Federally-assisted programs of
Department of Transportation-Effectuation of Title VI of
Civil Rights Act of 1964, and as said Regulations may be
amended.

Colonial, for itself, its successors in intere
and grantees does hereby further covenant and agree as a
covenant running with the land, that (1) no person on th
grounds of race, color, age, sex, or national origin sha
sxcluded from participation in, denied the benefit of, c
be otherwise subjected to discrimination in the use of s
facilities, (2) that in the construction of any improven
on, over, or under such land and the furnishing of servj
thereon, no person on the grounds of race, color, age, s
or national origin shall be excluded from participation
denied the benefits of, or otherwise be subjected to dis
nation, (3) that it shall use the premises in compliance
all other requirements imposed by or pursuant to Title
49, Code of Federal Regulations, Department of Transport
Subtitle A, Office of the Secretary, Part 21, Nondiscrii
in Federally-assisted programs of the Department of Trai
portation-Effectuation of Title VI of the Civil Rights i
of 1964, and as said Regulations may be amended.

(6)   In the event of breach of any of the abo·
covenants, the Metropolitan Nashville Airport Authority
have the right to re-enter said land and the above desc:
easement shall thereupon revert to and vest in and becoi
the absolute property of the Metropolitan Nashville Air;
Authority and its assigns.

(7) The Metropolitan Nashville Airport Authori
reserves unto itself, its successors and assigns, for the
and benefit of the public, a right of flight for the pass
of aircraft in the airspace above the surface of the ease
and of the real property, hereinafter described, together
with the right to cause in said airspace such noise as ma
be inherent in the operation of aircraft, now known or he
after used, for navigation of or flight in the said airsp
and for use of said airspace for landing on, taking off :
or operating on the Nashville Metropolitan Airport.

(8) The Metropolitan Nashville Airport Author.
expressly agrees for itself, its successors and assigns,
restrict the height of structures, objects of natural gr
and other obstructions in the described easement, and re
property to a height of not more than that prescribed in
77 of the Federal Aviation Regulations.

(9) The Metropolitan Nashville Airport Author
expressly agrees for itself, its successors and assigns,
to prevent the use of the easement and real property whi
would interfere with or adversely affect the operation (
maintenance of the Nashville Metropolitan Airport or oth
constitute an airport hazard.

In witness whereof, the parties have executed document on this the _14th_ day of _MAY_ , 1976.

APPROVED AS TO FORM
AND LEGALITY

Charle E. Dyer e
Griffith and Stokes

METROPOLITAN NASHVILLE
AIRPORT AUTHORITY

by _____
Chairman, Board of C

_____
Executive Direc

WITNESS:

_____
Director, Finance and
Administration

COLONIAL PIPELINE COMPANY

By _Glenn H. Gil_

WITNESS:

_____
ASSISTANT SECRETARY

Authorized pursuant to Board of Commissioners'
Res # 76-9 dated _3/19/76_ .

_____
Secretary

-9-



Exhibit "A"

COLONIAL PIPELINE CO.
ATLANTA, GEORGIA

# EXHIBIT 2

## MEMORANDUM OF UNDERSTANDING

## BETWEEN THE STATE OF TENNESSEE DEPARTMENT OF TRANSPORTATION
## AND THE METROPOLITAN NASHVILLE AIRPORT AUTHORITY

WHEREAS, the STATE OF TENNESSEE DEPARTMENT OF TRANSPORTATION ("Department") proposes to construct a project within the geographical limits of the Metropolitan Government of Nashville and Davidson County, Tennessee, tentatively described as the realignment of Donelson Pike/State Route 255, PIN 116896.00 (the "Highway Project"), which Highway Project will require the Department to acquire real property and/or property rights from the METROPOLITAN NASHVILLE AIRPORT AUTHORITY ("MNAA"); and

WHEREAS, the Parties wish to cooperate for the purpose of advancing the Highway Project;

NOW, THEREFORE, the parties agree as follows:

1. In consideration for the construction and ongoing maintenance of the Highway Project by the Department, MNAA agrees to dedicate to the State of Tennessee at no additional cost a permanent right-of-way easement on real property owned by MNAA, said property tentatively described as the realigned Donelson Pike/State Route 255 (stretching from Murfreesboro Pike to the Interstate 40 Interchange) as required for Highway Project right-of-way, along with any additional temporary easement(s) required for the Highway Project, as will be shown in detail on the Highway Project plans during design development. The Department agrees that said conveyance shall include a reversionary clause such that should the portion of land comprising said permanent right-of-way easement cease to be used as a state route, the Department

will abandon the easement and have no further property interest in the real property owned by MNAA.

    2.       MNAA agrees to sell to the State of Tennessee at fair market value the fee simple interest to real property owned by MNAA as required for controlled access right-of-way for the realigned Interstate 40 Interchange portion of the Highway Project, as will be shown in detail on the Highway Project plans during design development.

    3.       The Parties agree that the Department will design and construct the Highway Project, inclusive of "tie-ins" to the new MNAA Terminal Drive to be further defined during design development, as depicted in concept on Exhibit A attached hereto. MNAA in turn agrees to design and construct a new Terminal Drive inner roadway system as depicted in concept on Exhibit A (the "Airport Project"). Both Parties acknowledge that the Highway Project and the Airport Project are intended to proceed concurrently and agree to work together to develop a mutually beneficial phasing plan that maintains adequate access to airport facilities at all times and eliminates impacts to the traffic operations of the existing Interstate 40 Interchange throughout the duration of the Highway Project.

    4.       The Parties mutually agree to work together to analyze whether any fill material generated by the Airport Project in the area of the existing Donelson Pike alignment on MNAA property might be beneficial for the Department's use in constructing the Highway Project.

    5.       The Highway Project is shown on the Department's 2019-21 Comprehensive Multimodal Program with funding for the Right-of-Way Phase in Fiscal Year 2019 and the Construction Phase in Fiscal Year 2021.

    6.       The Parties agree that each shall conduct separate National Environmental Policy Act ("NEPA") processes for their respective projects. The Department agrees to provide copies

2

of its completed technical studies and approved NEPA document for the Highway Project to MNAA for inclusion in MNAA's NEPA process for the Airport Project.

7.      Upon completion of the Highway Project, the Department agrees, in accordance with applicable laws, rules, and policies, including but not limited to Tenn. Code Ann. § 12-2-112(a)(8) and Department Policy 340-04, to accept application(s) from MNAA for the conveyance of surplus real property to MNAA, including portions of the existing controlled access right-of-way necessary for the Airport Project as will be shown in detail on the Highway Project plans during design development; however, the Parties understand that some portion(s) of said real property may revert to MNAA by operation of law upon completion of the Highway Project, and the Parties agree that the Department's surplus real property application process shall not apply for any such portion(s) of real property. The Department further agrees that, in the event that MNAA needs temporary access to State right-of-way in order to accomplish the Airport Project, the Department will issue a *Permit for Project Within Highway Right-of-Way* to MNAA upon MNAA's successful completion of the Department's standard permitting process.

8.      Upon completion of the Project, the Department agrees, in accordance with applicable laws, including but not limited to Title 54, Chapters 1 and 5, Tennessee Code Annotated, to be responsible for maintaining the realigned Donelson Pike/State Route 255 highway constructed as part of the Highway Project. MNAA understands and agrees that utility installations may be permitted by the Department upon said permanent easement in accordance with applicable laws, rules, and policies, including but not limited to Tenn. Comp. R. & Regs. 1680-06-01.

3

9.    Each Party agrees to be responsible for its own negligent acts or omissions or those of its officers or employees arising out of this Memorandum of Understanding, to the extent permitted by law.

IN WITNESS WHEREOF, the Parties have caused this Memorandum of Understanding to be executed by their duly authorized officials.

**METROPOLITAN NASHVILLE AIRPORT AUTHORITY**

BY: _____      DATE: 11/14/18
A. Dexter Samuels, Ph. D.
MNAA Board Chair

BY: _____      DATE: 11/14/18
Douglas E. Kreulen, AAE
President & CEO

APPROVED AS TO FORM AND LEGALITY:

BY: _____      DATE: 11/14/2018
J. Douglas Sloan, III
Chief Legal Officer

**STATE OF TENNESSEE**
**DEPARTMENT OF TRANSPORTATION**

BY: _____      DATE: 11/16/18
John C. Schroer, Commissioner

APPROVED AS TO FORM AND LEGALITY:

BY: _____      DATE: 11/16/18
John H. Reinbold, General Counsel

4



NASHVILLE INTERNATIONAL AIRPORT (BNA)
METROPOLITAIN NASHVILLE AIRPORT AUTHORITY
MNAA PROJECT NO. 1801
TERMINAL ACCESS ROAD IMPROVEMENTS

# EXHIBIT 3



NOT ISSUED FOR CONSTRUCTION

CONNECT TO EXISTING 8"
AND 12" LINES FROM WEST TO
NEW 8" AND 12" LINES TO EAST

EXISTING 8" AND 12" LINES
TO BE ABANDONED

NEW 8" AND 12" LINES (BORE)

EXISTING 8" LINE TO BE
REMOVED OR ABANDONED

CONNECT NEW 8" LINE
FROM WEST TO EXISTING 8" LINE
TO THE EAST

EXISTING 12" LINE TO
BE REMOVED OR ABANDONED

NEW 12" LINE (TRENCH)

CONNECT NEW 12" LINE FROM
WEST TO EXISTING 12" LINE
TO THE EAST

EXISTING 8" LINE

**ATKINS**
Member of the SNC-Lavalin Group

404 BNA Drive, Suite 500
Nashville, Tennessee 37217
Phone: 615-399-0288

NASHVILLE INTERNATIONAL AIRPORT (BNA)
METROPOLITAN NASHVILLE AIRPORT AUTHORITY
MNAA PROJECT NO. 1801
TERMINAL ACCESS ROAD IMPROVEMENTS

JOB NO. 100092049
DATE PRELIMINARY
DESIGNED BY BPB
DRAWN BY SLT AAA

DRAWING NAME
OPTION 1A -
COMPLETE
RELOCATION

DRAWING NUMBER

C:\pw_workfdir\main01\luma2268\dms03159\Exhibit_Fuel Line Alignments_Option 1A.dwg



NOT ISSUED FOR CONSTRUCTION

CONNECT TO EXISTING 8"
AND 12" LINES FROM WEST TO
NEW 8" AND 12" LINES TO EAST

EXISTING 8" AND 12" LINES
TO BE ABANDONED

NEW 8" AND 12" LINES (BORE)

EXISTING 8" LINE TO BE
REMOVED OR ABANDONED

EXISTING 12" LINE TO
BE REMOVED OR ABANDONED

CONNECT NEW 8" LINE
FROM WEST TO EXISTING 8" LINE
TO THE EAST

CONNECT NEW 12" LINE
FROM WEST TO EXISTING 12" LINE
TO THE EAST

NEW 12" LINE
(TRENCH)

EXISTING 12" LINE

EXISTING 8" LINE

ATKINS

NASHVILLE INTERNATIONAL AIRPORT (BNA)
METROPOLITAIN NASHVILLE AIRPORT AUTHORITY

MNAA PROJECT NO. 1801
TERMINAL ACCESS ROAD IMPROVEMENTS

DRAWING NAME
OPTION 1B -
PARTIALLY
COMPLETE
RELOCATION



NOT ISSUED FOR CONSTRUCTION

CONNECT EXISTING 8" AND 12" LINES
FROM WEST TO NEW 8" AND 12" LINES
TO THE EAST

EXISTING 8" AND 12"
LINE TO BE ABANDONED
OR REMOVED

NEW 8 AND 12" LINE

CONNECT NEW 8" LINE FROM
WEST TO EXISTING 8" LINE TO EAST

NEW 8" LINE

NEW 8" AND 12" LINES

EXISTING 8" LINE

NEW 12" LINE

CONNECT NEW 12" LINE FROM
WEST TO EXISTING 12" LINE
TO THE EAST

EXISTING 12" LINE

EXISTING 8" LINE

ATKINS

404 BNA Drive, Suite 600
Nashville, Tennessee 37217
Phone: 615.288.0288

NASHVILLE INTERNATIONAL AIRPORT (BNA)
METROPOLITAIN NASHVILLE AIRPORT AUTHORITY

MNAA PROJECT NO. 1801
TERMINAL ACCESS ROAD IMPROVEMENTS

JOB NO.
DATE          PRELIMINARY
DESIGNED BY
DRAWN BY

DRAWING NAME
OPTION 2 -
INTERMEDIATE
RELOCATION

DRAWING NUMBER



NOT ISSUED FOR CONSTRUCTION

CONNECT EXISTING 8" AND 12" LINES FROM WEST TO NEW 8" AND 12" LINES TO THE EAST

EXISTING 8" AND 12" LINE TO BE ABANDONED OR REMOVED

CONNECT NEW 8" AND 12" LINES FROM WEST TO EXISTING 8" AND 12" LINE TO EAST

NEW 8 AND 12" LINE

EXISTING 8" LINE

NEW 12" LINE TO AVOID CONFLICT WITH BRIDGE AND EW (ROAD) CONFLICT TO BE ADDRESSED BY DOT

EXISTING 12" LINE

EXISTING 8" LINE

**ATKINS**
Member of the SNC-Lavalin Group
404 BNA Drive, Suite 500
Nashville, Tennessee 37217
Phone: 615-399-0298

NASHVILLE INTERNATIONAL AIRPORT (BNA)
METROPOLITAN NASHVILLE AIRPORT AUTHORITY
MNAA PROJECT NO. 1801
TERMINAL ACCESS ROAD IMPROVEMENTS

JOB NO.
DATE: PRELIMINARY
DESIGNED BY
DRAWN BY

DRAWING NAME
OPTION 3 -
MINIMUM
RELOCATION

DRAWING NUMBER

# EXHIBIT 4

| From: | Morinec, Jim |
|---|---|
| To: | Jacobsen, Dan; Rodrigues, Igor; Andrew Fleming; Jeff Crisp; Mitchell, Cody |
| Cc: | Holton, Traci; Martin, Margaret; Morrissey, Ted |
| Subject: | Colonial Pipeline Relocation |
| Date: | Thursday, September 19, 2019 4:04:50 PM |
| Attachments: | image003.jpg |
| | Donelson DSP OPT 1.pdf |

A conference call was held on September 19 to discuss the proposed plan for relocating Colonial Pipelines in conjunction with the relocation of Donelson Pike and the MNAA TARI projects.

Participants in the call: Dan Jacobsen, Colonial

Igor Rodrigues, Colonial

Andrew Fleming, Kleinfelder

Jeff Crisp, Kleinfelder

Cody Mitchell, MNAA

Jim Morinec, MNAA

The proposed alignment is shown in the attached plan. Colonial plans to relocate Line 19 from under the end of RWY 2L/20R to parallel Line 20 adjacent to the TVA. The relocation will begin at the L19/L20 split on the east side of the runway and follow L20 to a point east of the new Donelson Pike interchange. From this point both Lines 19 and 20 will follow a new alignment, using directional boring, to a point west of the Discreet Access exit from I-40, where it will reconnect to the existing pipes. The existing pipeline system between these points will be abandoned in place.

Points of Discussion:

1. The existing easement for Line 20 that is adjacent to the TVA may need to be widened to accommodate the relocated Line 19. The design has not been developed yet to determine if this will be required.
2. The new alignment that will be placed by directional boring will require a new easement. This easement travels through MNAA property, MNAA property that will become TDOT ROW, TDOT ROW that will revert back to MNAA, TDOT ROW that will be purchased by MNAA as excess lands, and TDOT ROW that MNAA may acquire for its new monument sign. The timing for all of these transactions is not known. Dan Jacobsen will ask his legal department to initiate conversations with MNAA and TDOT to allow the relocation to proceed in advance of the Donelson and TARI projects.
3. The status of the easements for the existing lines to be abandoned in place needs to be determined.
4. Colonial will provide available alignment and profile information for the lines to be abandoned. MNAA will evaluate this information to determine where the proposed projects will conflict. Colonial will remove the pipes in these areas. Even it the pipe is abandoned, if it is hit Colonial will shut down the entire system until its status is confirmed.
5. It was noted that the proposed directional boring will pass near a water quality unit in Lot B and a TVA tower in the northwest corner of lot C. The pipeline profile should be able to avoid these obstacles, depending on the geotechnical conditions.
6. Colonial asked for MNAA's contact with TVA.
7. The project will involve two crossings of McCrory Creek. MNAA will provide permitting information based on a recently completed project for FAA cables.
8. The Colonial project is anticipated to be completed in mid-2021. All existing pipes will remain in service until the product transmission can be switched to the relocated system.

9. It was pointed out the proposed relocation will also cross the existing sanitary sewer and FAA power and communication lines.

10. Colonial will fully assemble the pipes that will be pulled into the directional bores. Cody Mitchell suggested a construction easement would typically not be required for the assembly area. Due to the amount of area required for this assembly, MNAA's legal department will be consulted to verify an easement will not be required.

Please let me know of any corrections to this record.

**James Morinec, PE**

Project Manager, Design
Development & Engineering
Employed by: AECOM
Office: 615-275-2430
Cell: 615-478-2113
One Terminal Drive, Ste. 501
Nashville, Tennessee 37214



**FLYNASHVILLE.COM**





LEGEND

| | |
|---|---|
| —L20—L20—L20— | EXISTING CPC LINE 20 (8-INCH) |
| —L19—L19—L19— | EXISTING CPC LINE 19 (12-INCH) |
| - - - - - | EXISTING UTILITY EASEMENTS |
| —OHW—OHW— | EXISTING TVA OVERHEAD WIRES |
| —R/W—R/W—R/W— | EXISTING TDOT ROW |
| —R/W—R/W—R/W— | PROPOSED TDOT ROW |
| | PROPOSED HDD |
| - - - - - - - | PROPOSED OPEN CUT |

APPROXIMATE LENGTHS:

| METHOD | LINE 19 (12-INCH) | LINE 20 (8-INCH) |
|---|---|---|
| HDD | 5000 FT | 4900 FT |
| OPEN CUT | 3610 FT | |
| JACK AND BORE #1 | 110 FT | |
| JACK AND BORE #2 | 80 FT | |
| NITROGEN PUSH | 8170 FT | 5980 FT |

KLEINFELDER
Bright People. Right Solutions.

REVISIONS

CONCEPTUAL PLANS
NOT FOR CONSTRUCTION

SCALE VERIFICATION

RELOCATION OPTION 1

TN MNA TDOT I40 DONELSON PIKE
PROPOSED LINES 19 AND 20 RELOCATION
I-40 (DONELSON PIKE)
NASHVILLE, TN

COLONIAL PIPELINE COMPANY
1185 SANCTUARY PARKWAY
SUITE 110
ALPHARETTA, GA 30009

EXHIBITS

EX-1

# EXHIBIT 5



# STATE OF TENNESSEE
## DEPARTMENT OF TRANSPORTATION

**REGION 3 UTILITIES DIVISION**
6601 CENTENNIAL BOULEVARD
NASHVILLE, TENNESSEE 37243-0360
(615) 350-4200

**CLAY BRIGHT**
COMMISSIONER

**BILL LEE**
GOVERNOR

January 23, 2020

Mr. Jim Avioli, Managing Director
Commercial Affairs
Colonial Pipeline Co.
1185 Sanctuary Parkway, Suite 100
Alpharetta, GA 30009

Dear Mr. Avioli:

After review, Colonial Pipeline's submitted A-Date relocation package for the I-40/Donelson Pike Interchange and Relocation Project (PIN 116896.00) is rejected. The submitted package requests 100% reimbursement for engineering and construction for a proposed relocation that mitigates conflicts created by two separate projects: the TDOT I-40/Donelson Pike Project and the MNAA TARI Project.

TDOT is able to reimburse Colonial for the portion of relocation that is required due only to a conflict within the State's project limits. There are single perpendicular crossings for both Line 19 and Line 20 that are in conflict with the proposed relocation of S.R. 255 (Donelson Pike). Relocation efforts due to conflicts associated with the MNAA TARI project will not be reimbursable by TDOT.

A "baseline" relocation plan and cost estimate (engineering & construction) for the relocation work that is necessitated by conflicts with the TDOT project shall be provided by Colonial to the state. In the event that an alternate relocation plan has greater benefits to Colonial Pipeline, such as a single relocation that complements both the TDOT and MNAA projects, then Colonial shall provide a second submittal containing the alternate relocation plan and cost estimate (engineering & construction). Once the preferred relocation plan is reviewed and approved, Colonial will only be eligible for reimbursement in the amount shown on the approved "baseline" cost estimate that mitigates conflicts created by the TDOT project only.

Additional information including the exact location of the contaminated soils referenced in the submittal is required to provide justification for the selection of the relocation alignment for Line 19. If there are contaminated soils that impact how Colonial is able to relocate Line 19 in order to accommodate the TDOT project (e.g. HDD limits extended to the east of the strike location) then any such additional work should be included in the "baseline" plan and cost estimate referenced above.

At your earliest convenience, please resubmit a revised A-Date package that represents the engineering and construction costs for the mitigation of the TDOT I-40/Donelson project only.

If I can be of further assistance, please do not hesitate to contact me by phone at (615)350-4234 or by email at iraj.eghbali@tn.gov

Respectfully,

Iraj Eghbali
Senior Transportation Project Specialist

CC: Mr. Shane Hester
    Ms. Leslie South
    Mr. Freddy Miller
    Mr. John Reinbold
    Mr. Jon Zirkle
    Mr. Jeff Hoge
    Mr. Michael Horlacher
    Mr. Cody Crews (GS)

# EXHIBIT 6



March 24, 2020

Colonial Pipeline Company
Attn: Preston Morrison
1185 Sanctuary Parkway, Suite 100
Alpharetta, GA 30009

Re:  Easement Relocation

Dear Mr. Morrison:

Colonial Pipeline Company ("Colonial") and Metropolitan Nashville Airport Authority ("MNAA") are parties to a Dedication of Easement and Agreement dated May 14, 1976 (the "Easement") in which MNAA granted Colonial a permanent easement for the construction, operation, and maintenance of a liquid petroleum pipleline.

Colonial is aware from prior discussions with MNAA dating back to July 2018 that the current location of Colonial's easements (shown on the attached drawing) interfere with MNAA's plans for expansion and related construction and that, with respect to movement of the lines, time is now of the essence.

MNAA's plans to expand their airport operations require a relocation of the pipeline and the easement. All points of conflict with the existing pipeline and easement are shown on the attached drawing.  Section 3 of the Easement provides that Colonial will relocate its easements at its sole cost and expense upon notification from MNAA that its lines interfere with the expansion, development, and/or construction to be undertaken by MNAA.

This letter shall serve as MNAA's formal notice of Colonial's easement interference and its demand that Colonial relocate its pipelines at its sole cost and expense as required under Section 3 of the Easement.

We appreciate your cooperation and look forward to working with Colonial in the immediate future to finalize plans to relocate the easements. MNAA will be in touch soon to finalize a plan to relocate the pipeline.

Feel free to contact me should you have any questions.

Regards,

John A. Corbitt
Assistant VP of Real Estate

Case 3:20-cv-00809   Document 94-1   Filed 10/13/21   Page 52 of 75 PageID #: 1127



NOT FOR CONSTRUCTION

NOTE:
ALL IDENTIFIED CONFLICT LOCATIONS ARE BASED ON A 30% PRELIMINARY DESIGN FOR THE TARI PROJECT. ACTUAL CONFLICT POINTS WILL BE DETERMINED DURING FINAL PROJECT DESIGN.

ALL IDENTIFIED CONFLICT LOCATIONS ARE EXCLUSIVE OF CONFLICTS ASSOCIATED WITH THE TDOT DONELSON PK RELOCATION PROJECT.

PLAN VIEW
SCALE: 1"=100'

BEGIN - PROPOSED WATER MAIN AND ROADWAY WIDENING

END - PROPOSED WATER MAIN AND ROADWAY WIDENING

BEGIN - ROADWAY RAMP GRADING

END - ROADWAY RAMP GRADING

ROADWAY RAMP GRADING

PARKING LOT EXPANSION

ROADWAY GRADING AND DRAINAGE

BRIDGE AND RETAINING WALL FOUNDATIONS

REVENUE CONTROL FOUNDATION

ROADWAY GRADING

TARI ROADWAYS AND PARKING LOTS

| DRAWN BY: | JCM | | METROPOLITAN NASHVILLE AIRPORT AUTHORITY |
| CK. BY: | | NOT FOR | TERMINAL ACCESS ROADWAY IMPROVEMENTS (TARI) |
| DATE: | | CONSTRUCTION | COLONIAL PIPELINE - POINTS OF CONFLICT |

BNA  Nashville International Airport

# EXHIBIT 7



# Colonial Pipeline Company

**Meg Blackwood, Deputy General Counsel**

**Mobile Phone: (678) 221-1960**
**mblackwood@colpipe.com**

April 8, 2020

John A. Corbitt
Assistant V.P. of Real Estate
Metropolitan Nashville Airport Authority
One Terminal Drive, Suite 501
Nashville, TN 37214

Re:    Colonial Pipeline Easement Relocation

Dear Mr. Corbitt:

I am responding to your letter of March 24, 2020, to Colonial Pipeline Company (Colonial) providing notice that the expansion plans of Metropolitan Nashville Airport Authority (MNAA) require relocation of a Colonial pipeline and easement. Your letter was addressed to Skip Morrison, but, as I mentioned to you last week via e-mail, Mr. Morrison retired from Colonial in December 2017. That caused some delay as the letter had to get routed to me while we are on work from home directives as a result of the pandemic. Please be sure that any further correspondence is directed to the General Counsel or to me. Also, please note the conflicts marked on the drawing attached to your letter will affect portions of two Colonial pipelines and related easements. Colonial acknowledges your letter as the notice required under section 3 of the Easement Agreement referenced in your letter for all easements affected by these conflicts.

As MNAA is aware, for some time, Colonial has been in the process of planning a relocation of its two pipelines (Lines 19 and 20) that are impacted by the planned Tennessee Department of Transportation (TDOT) Donelson Pike I-40 interchange expansion and relocation project and MNAA's planned expansion project. It is our understanding TDOT and MNAA are coordinating various aspects of these two projects. Indeed, since at least September 2018, when TDOT hosted a field review meeting that was attended by representatives from TDOT, MNAA, Colonial and other impacted utilities, TDOT has taken the lead for utility relocation on both projects. Our understanding is that TDOT has shared information with MNAA about the impact that MNAA's and TDOT's projects will have on Colonial's pipelines.

The relocation of Colonial's pipelines is a complex, multi-million dollar project that takes a great deal of coordination and planning, particularly when (as is the case here) the relocation is done at the request of a third-party and not because of Colonial's own operational needs. In this specific instance, the process is even more complicated because of the incident that occurred on April 9, 2019, when a TDOT geotechnical crew, working in conjunction with MNAA, struck Colonial's Line 19.

1185 Sanctuary Parkway, Suite 100; Alpharetta, Georgia 30009
P.O. Box 1624; Alpharetta, Georgia 30009-9934

The contamination from that incident has caused Colonial to have to reconfigure its relocation plans. Nevertheless, Colonial remains committed, as we have been since 2018, to working with TDOT and MNAA to accomplish the requested relocation.

It is not cost effective or desirable for Colonial to do separate pipeline relocation projects to address the TDOT and MNAA projects. Accordingly, Colonial has been in discussions with TDOT and MNAA for some time about Colonial's proposed plan to do a single project, relocating both pipelines in a manner that would address all conflicts with the TDOT project and the MNAA project. In fact, representatives from MNAA and Colonial have had several meetings since 2018 (both in Alpharetta and Nashville) to discuss various technical aspects of the relocation, including the proposed route of the relocation. Colonial trusts that MNAA will continue to work with TDOT and us on that effort. We are happy to discuss all of this with you.

Finally, aside from the complicated technical aspects of relocating our lines, the associated costs (which require Board level approval at Colonial) are directly tied to the scope of the project that has not been finalized. There are complicated interwoven issues related to payment for our relocation caused by the presence of the two projects, which need to be resolved before we seek Board level approval. We reserve all of our rights, including but not limited to rights under the Easement Agreement, with respect to payment for the proposed relocation.

Thus, we appreciate the notice under section 3 of the Easement Agreement, and we remain committed to working cooperatively to finalize the scope, timing and payment of the relocation projects. We look forward to making further progress with MNAA and TDOT on these topics. Thank you.

Best regards,

/s/ Meg Blackwood

Meg Blackwood
Deputy General Counsel, Colonial Pipeline Company

**Error! Unknown document property name.**

Case 3:20-cv-00809 Document 94-1 Filed 10/13/21 Page 56 of 75 PageID #: 1131

# EXHIBIT 8



**STATE OF TENNESSEE**
**DEPARTMENT OF TRANSPORTATION**
**REGION 3 PROJECT DEVELOPMENT/UTILITIES DIVISION**
6601 CENTENNIAL BOULEVARD
NASHVILLE, TENNESSEE 37243-0360
(615) 350-4250

**CLAY BRIGHT**
COMMISSIONER

**BILL LEE**
GOVERNOR

July 16, 2020

Mr. Jim Avioli, Managing Director
Commercial Affairs
Colonial Pipeline Co.
1185 Sanctuary Parkway, Suite 100
Alpharetta, GA 30009

**Subject:** Davidson Co. PIN 116896/I-40 /Donelson Pike Interchange gas pipeline relocation package

Dear Mr. Avioli;

After review, Colonial's re-submitted A-Date relocation package for the I-40/Donelson Pike Interchange and Relocation Project (PIN 116896.00) dated May 20, 2020 is rejected. The submitted package reflects relocating Line 19 (12" pipeline) alongside/parallel to Line 20 (8" pipeline) requiring an additional 5,800 linear feet relocation of Line 19. TDOT and the Federal Highway Administration (FHWA) acknowledges that the consolidation of Colonial's facilities on the Metro Nashville Airport Authority's property is an improvement for the long term maintenance and longevity of the pipeline; however, this improvement is defined as "betterment" and cannot be fully reimbursed by TDOT for this project.

TDOT is able to reimburse Colonial for the portion of relocation that is required due only to a conflict within the State's project limits. There are single perpendicular crossings for both Line 19 and Line 20 that are in conflict with the proposed relocation of S.R. 255 (Donelson Pike). Relocation efforts due to conflicts associated with the MNAA TARI project or to improve existing infrastructure will not be reimbursable by TDOT.

Attached is an example "baseline" relocation plan prepared by an independent consultant on the behalf of TDOT. The plan reflects relocation work necessitated by conflicts with the TDOT project to mitigate the 41' cut on Line 19 and 37' fill over Line 20. Both relocations require a Horizontal Direction Drill (HDD) across the proposed TDOT project limits to provide adequate vertical separation from the proposed excavation and/or infrastructure to protect the pipeline from TDOT construction activities. Based on field data collected from the April 9, 2019 line strike, Line 19 is shown to be relocated south of the line strike location with the proposed HDD entry point located approximately 260' south-east of the strike location. Using historical data on relocation costs across the southeast for similar pipeline relocations it

is estimated that a "baseline" relocation would cost approximately $6 million or 50% of Colonial Pipeline's estimate submitted on May 20, 2020.

To request reimbursement for this project, a "baseline" relocation plan and cost estimate (engineering & construction) for the relocation work that is necessitated by conflicts with the TDOT project shall be provided by Colonial to the state. Once the preferred relocation plan is reviewed and approved, Colonial will only be eligible for reimbursement in the amount shown on the approved "baseline" cost estimate that mitigates conflicts created by the TDOT project only. Colonial may still pursue other routes that do not conflict with either project like the one attached or the originally proposed or other but the reimbursement rate regardless of total cost will not exceed the "baseline" estimate.

At your earliest convenience, please resubmit a revised A-Date package that represents the engineering and construction costs for the mitigation of the TDOT I-40/Donelson project only. The package should be addressed to Mr. Iraj Eghbali, TDOT Region 3 Utility Manager.

If you have further questions or need more information you may contact me at 615-350-4234 or by email at iraj.eghbali@tn.gov

Sincerely,

Iraj Eghbali
Senior Transportation Project Specialist
TDOT Region 3 Utility Office

Cc:     Mr. Jeff Hoge
        Mr. Michael Horlacher
        Mr. Shane Hester
        Mr. Jon Zirkle
        Ms. Leslie South
        Mr. Freddy Miller
        Mr. John Reinbold
        Mr. Cody Crews (GS)

# EXHIBIT 9



**From:** Blackwood, Meg <mblackwood@colpipe.com>
**Sent:** Thursday, August 13, 2020 12:55 PM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Morrissey, Ted <Ted.Morrissey@flynashville.com>
**Subject:** RE: CP/MNAA line relocation meeting

**External Message**

Paul:

Without agreeing to the specific statements in your email, Colonial will abide by your postponement of the meeting. I will send out the cancelation notification.

Colonial remains willing to meet in the future under the proper circumstances. We should continue to discuss when that meeting should take place and the appropriate agenda for it. In the meantime, if your clients have any specific questions or concerns related to Colonial and the proposed relocation project that they would like to discuss with us, we would be happy to talk.

Best regards,
Meg

 **Meg T. Blackwood** | Deputy General Counsel
Colonial Pipeline Company
o. 678.762.2644 | m. 678.221.1960 | www.colpipe.com

  

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Sent:** Thursday, August 13, 2020 12:18 PM
**To:** Blackwood, Meg <mblackwood@colpipe.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Morrissey, Ted <Ted.Morrissey@flynashville.com>
**Subject:** [External Message] RE: CP/MNAA line relocation meeting

> WARNING: This email originated outside of Colonial Pipeline.
> DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Meg, the meeting we proposed between TDOT, Colonial and the Airport was meant to get all parties involved in the pipeline relocation to jointly identify and resolve any open issues so that the Airport's expansion project could move forward without further delay. TDOT and the Airport are transparently coordinating their efforts in this regard as efficiently and cost effectively as possible. Colonial's refusal to provide the Airport with a clear and concise statement of its position regarding movement of the pipeline and its refusal to discuss any open issues or concerns together with TDOT and the Airport unnecessarily frustrates those efforts. Given the restrictions Colonial unilaterally imposes in your email below, the Airport believes it best to postpone any meeting until after Colonial identifies and communicates what issues related to the pipeline relocation it believes are so unique to the Airport that they should not be discussed in TDOT's presence. We appreciate Colonial taking the time it had set aside for today's meeting to do so.

Thank you,

Paul

Paul S. Davidson

Partner

## waller

Waller Lansden Dortch & Davis, LLP

511 Union Street, Suite 2700

Nashville, TN 37219

(o)615.850.8942

(m)615.504.0543

pdavidson@wallerlaw.com@wallerlaw.com

vCard

**From:** Blackwood, Meg <mblackwood@colpipe.com>
**Sent:** Wednesday, August 12, 2020 8:41 PM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Morrissey, Ted <Ted.Morrissey@flynashville.com>
**Subject:** RE: CP/MNAA line relocation meeting

**External Message**

Paul:

In the spirit of good faith and cooperation, we are willing to attend the meeting tomorrow. However, we do not agree that the agenda items you've listed are appropriate for the audience who will be there. This meeting was meant to be a discussion between Colonial and MNAA to discuss issues that are unique to our clients. It is not appropriate for TDOT to be involved in those conversations, and so if they attend the meeting tomorrow, we will not discuss those issues. To reiterate what I've said before, several times, we are not opposed to having another meeting with TDOT and MNAA to discuss the issues that may apply to everyone, but we are not willing to discuss concerns that are uniquely MNAA/Colonial in the presence of TDOT.

Best regards,

 **Meg T. Blackwood** | Deputy General Counsel
Colonial Pipeline Company
o. 678.762.2644 | m. 678.221.1960 | www.colpipe.com

   

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the

original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Sent:** Wednesday, August 12, 2020 7:37 PM
**To:** Blackwood, Meg <mblackwood@colpipe.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Morrissey, Ted <Ted.Morrissey@flynashville.com>
**Subject:** [External Message] RE: CP/MNAA line relocation meeting

WARNING: This email originated outside of Colonial Pipeline.
DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Meg, I include a proposed agenda below that has been approved by the Airport and TDOT. TDOT's representatives at the meeting, if Colonial will reconsider and participate, will be Shane Hester, Regional Director of Project Development. He is familiar with the pipeline relocation issues and has consistently participated in meetings and teleconferences with both the Airport and Colonial. Leslie South, Deputy General Counsel and John Reinbold also plan to join the meeting. On the Airport's side, Margaret Martin, Traci Holton, Cody Mitchell, Jim Morinec, Ted Morrissey and I plan to attend.

The Airport is committed to coordinate efforts with TDOT to minimize public costs and project delays. We have previously made it clear that it is time for the Airport, TDOT and Colonial to join in a meeting to discuss all open pipeline relocation issues.


I.      Introductions of Participants and their roles (Airport, Colonial, TDOT)
II.     Airport's Summary of Expansion Plans and Prior Discussions with Colonial re Pipeline Relocation
III.    Timeline for Pipeline Relocation
        a.      Airport's requirements
        b.      TDOT's requirements
IV.     Colonial's Relocation Route
        a.      Timing of final plan submittal
        b.      Time to complete
        c.      Open business, governance, technical or legal issues
        d.      Impacts/complications from line strike

V.    Funding issues

VI.    Next Steps

Thank you,

Paul
Paul S. Davidson
Partner

# waller

Waller Lansden Dortch & Davis, LLP

511 Union Street, Suite 2700
Nashville, TN 37219
(o)615.850.8942
(m)615.504.0543
pdavidson@wallerlaw.com@wallerlaw.com
vCard

**From:** Blackwood, Meg <mblackwood@colpipe.com>
**Sent:** Wednesday, August 12, 2020 4:08 PM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>
**Subject:** RE: CP/MNAA line relocation meeting

**External Message**

Paul:

Thank you for your note. We do not agree that TDOT should attend this meeting and are not comfortable moving forward tomorrow with TDOT present. While we prefer to do one relocation project, rather than move piecemeal, as my letter stated, there are issues with the relocation project that are distinct to TDOT and your client. We are addressing the TDOT issues with TDOT, separately, and we want to do the same thing with your client. If it makes sense in the future to invite TDOT to meetings, we can do that, but I would ask that we have those discussions and reach an agreement before you forward meeting invitations to TDOT or other third-parties.

If your client is unwilling to proceed without TDOT's presence at the meeting, please let me know, and I'll cancel the meeting. However, if we are moving forward tomorrow, we are still waiting on the Airport's proposed agenda items. Please send those along so that we're prepared to address your

client's questions. I sent you our items yesterday.

Best regards,
Meg

 **Meg T. Blackwood** | Deputy General Counsel
Colonial Pipeline Company
o. 678.762.2644 | m. 678.221.1960 | www.colpipe.com

   

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Sent:** Tuesday, August 11, 2020 6:04 PM
**To:** Blackwood, Meg <mblackwood@colpipe.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>
**Subject:** [External Message] RE: CP/MNAA line relocation meeting

WARNING: This email originated outside of Colonial Pipeline.
DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Meg, for many of the reasons stated in your attached letter, and the fact that there seems to be a disconnect between what we've heard from Colonial and TDOT as to the status, we feel it appropriate to invite TDOT to this meeting. Sorry if my message wasn't clear. I passed the invite to John Reinbold so that he could determine who would be best on the project side to attend from TDOT. I believe he will let us know.

Hope that helps,

Paul

Paul S. Davidson
Partner
**waller**
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700

Nashville, TN 37219
(o)615.850.8942
(m)615.504.0543
pdavidson@wallerlaw.com@wallerlaw.com
vCard


**From:** Blackwood, Meg <mblackwood@colpipe.com>
**Sent:** Tuesday, August 11, 2020 4:17 PM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>
**Subject:** RE: CP/MNAA line relocation meeting


**External Message**

Paul:

We don't think it's necessary or productive to include TDOT on this particular call. We understood the purpose of this call was to exchange information about the Airport's intended work, how that impacts Colonial, etc. As I mentioned during our prior conversation, Colonial has had many conversations with TDOT about their Donelson Pike project and how that impacts the pipeline, including one last week. If you can provide me with some clarity about why you think it's important to have TDOT, and in particular their legal counsel versus their technical/engineering people, participate in this meeting, that would be helpful.


 **Meg T. Blackwood** | Deputy General Counsel
Colonial Pipeline Company
o. 678.762.2644 | m. 678.221.1960 | www.colpipe.com

    

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Sent:** Tuesday, August 11, 2020 3:14 PM
**To:** Blackwood, Meg <mblackwood@colpipe.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>
**Subject:** [External Message] RE: CP/MNAA line relocation meeting

WARNING: This email originated outside of Colonial Pipeline.
DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Meg, I've forwarded the invitation to Ted Morrissey and John Reinbold.  Both the Airport and TDOT will have representatives on the call.  I will let you who when I know.

Thank you,

Paul
Paul S. Davidson
Partner

# waller
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
(o)615.850.8942
(m)615.504.0543
pdavidson@wallerlaw.com@wallerlaw.com
vCard

**From:** Blackwood, Meg <mblackwood@colpipe.com>
**Sent:** Tuesday, August 11, 2020 11:26 AM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>; 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>
**Subject:** RE: CP/MNAA line relocation meeting

**External Message**

The time on Friday is no longer available.  Our Managing Director, Commercial Affairs has a conflict on Friday.



**Meg T. Blackwood** | Deputy General Counsel
Colonial Pipeline Company
o. 678.762.2644 | m. 678.221.1960 | www.colpipe.com

   

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Sent:** Tuesday, August 11, 2020 12:24 PM
**To:** 'Hughes, Wearen' <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Blackwood, Meg <mblackwood@colpipe.com>
**Subject:** [External Message] RE: CP/MNAA line relocation meeting

WARNING: This email originated outside of Colonial Pipeline.
DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

And please let me know if times on Friday time are still available.

Paul S. Davidson
Partner

# waller

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
(o)615.850.8942
(m)615.504.0543
pdavidson@wallerlaw.com@wallerlaw.com
vCard

**From:** Hughes, Wearen <WHughes@bassberry.com>
**Sent:** Tuesday, August 11, 2020 11:22 AM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Meg Blackwood (mblackwood@colpipe.com) <mblackwood@colpipe.com>
**Subject:** RE: CP/MNAA line relocation meeting

**External Message**

Meg: do you have that time handy? I'm looking for your email to me that gave that.

**Wearen Hughes**
Member

**Bass, Berry & Sims PLC**
150 Third Avenue South, Suite 2800 • Nashville, TN 37201
615-742-6225 phone • 615-742-2725 fax
WHughes@bassberry.com • www.bassberry.com

**From:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Sent:** Tuesday, August 11, 2020 11:17 AM
**To:** Hughes, Wearen <WHughes@bassberry.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Meg Blackwood (mblackwood@colpipe.com)
<mblackwood@colpipe.com>
**Subject:** RE: CP/MNAA line relocation meeting

What time on Thursday do you propose?

Paul S. Davidson

Partner

**waller**

Waller Lansden Dortch & Davis, LLP

511 Union Street, Suite 2700

Nashville, TN 37219

(o)615.850.8942

(m)615.504.0543

pdavidson@wallerlaw.com@wallerlaw.com

vCard

**From:** Hughes, Wearen <WHughes@bassberry.com>
**Sent:** Tuesday, August 11, 2020 11:12 AM
**To:** Paul Davidson <Paul.Davidson@wallerlaw.com>
**Cc:** Goddard, Drew <DGoddard@bassberry.com>; Meg Blackwood (mblackwood@colpipe.com)
<mblackwood@colpipe.com>
**Subject:** CP/MNAA line relocation meeting

**█ External Message**

Meg asked me to convey this information to you. The following individuals will be attending the

meeting on Thursday re the line relocation on behalf of Colonial: Jim Avioli (Managing Director, Commercial Affairs), Leo Bermudez (Director of Project Management) and Don Pozin (Manager, Relocation Projects). Meg will be attending the meeting also, because you intend to participate, but CP views this more of a business-to-business than a legal meeting. CP anticipates the Airport will initiate or lead the discussion.

CP does not have a formal agenda, but the items it would recommend discussing are:

- Overview of the work that the Airport wants to do and timetable to complete it

- Discussion of Colonial proposed relocation, including impacts/complications from line strike

- Discussion of funding and timeline.

There might be some other things that arise during the course of the conversation, but those are the main points.

**Wearen Hughes**
Member

**Bass, Berry & Sims PLC**
150 Third Avenue South, Suite 2800 • Nashville, TN 37201
615-742-6225 phone • 615-742-2725 fax
WHughes@bassberry.com • www.bassberry.com

This email may contain privileged and confidential information and is meant only for the use of the specific intended addressee(s). Your receipt is not intended to waive any applicable privilege. If you have received this email in error, please delete it and immediately notify the sender by separate email.

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are proh bited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are proh bited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are proh bited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are proh bited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are proh bited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are proh bited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

Colonial Pipeline Notice - This e-mail message (including any attachment) contains information that may be confidential, be protected by attorney-client or other privilege, or constitute non-public information. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies. Use, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

# EXHIBIT 10



**Colonial Pipeline Company**

Don Pozin
Manager, Relocation Projects

Phone: (678) 762-2592
Mobile: (404) 273-5448
E-mail: dpozin@colpipe.com

April 8, 2021

Mr. Iraj Eghbali
Senior Transportation Project Specialist
Project Development Division /Utility Office
Region 3 Administrative Office, 2nd Floor
6601 Centennial Blvd., Nashville, TN 37243-0360

Dear Mr. Eghbali:

Colonial is in receipt of your letters dated 10/26/20 and 1/8/21. The letters included offers by TDOT to reimburse Colonial 30% of all actual, eligible costs related to the entire relocation of our pipelines and 25% of all actual costs incurred by Colonial to obtain a replacement easement, respectively. Both of these offers relate to the work that would be necessary to relocate both of our active pipelines to accommodate the Donelson Pike Expansion and MNAA TARI projects.

I have discussed these issues several times since January with Jon Zirkle and have let him know that Colonial is in general agreement with these offers. However, as TDOT is well aware, this is not a standard relocation project. This project involves not only the TDOT work related to Donelson Pike but also relocation to accommodate MNAA's TARI project. Colonial cannot execute any agreements with TDOT related to its portion of the relocation until we have all the relocation project plans finalized. Despite our diligent efforts, including in the mediation over the last few months in which TDOT has been involved, to date Colonial has not been able to reach an agreement with MNAA on how the portions of the relocation project that are directly related to the TARI project will be funded, or the timeline for the project. Those key issues, as well as other important ancillary issues, such as ROW agreements for areas where the relocated pipeline will be placed, must be decided before we can enter into any agreements related to the relocation project. As you also know, a further complicating issue is that, on April 9, 2019, a crew working for TDOT, with the involvement of MNAA and AECOM, struck Colonial's Line 19, which resulted in gasoline being released and contaminating soil and groundwater in the area. As we have discussed with TDOT and MNAA, this contamination has impacts on the relocation project that must be addressed before we can finalize the relocation plans and agreements.

Colonial is willing to move forward and collaborate with TDOT on submitting a revised A-Date package that would show the cost apportionment outlined above. The A-Date package has a section on Page 6.1 for schedule. At this time, Colonial would be able to include a revised set of "Days to Complete" requested on this page, but we would need to include a statement in the Special Conditions section that the number of calendar days will begin shortly after reaching global resolution with all parties.

TDOT0001806



I must also mention that Colonial takes exception to a number of technical items raised by TDOT in the letters we received, specifically around labor rates, number of inspectors, appropriate contingency factor, and some other items. We believe that these are less impactful differences and can be worked out collaboratively when completing the A-Date package. With Colonial potentially bearing a significant portion of the cost for the relocation, we are as motivated as ever to complete the project in an efficient and cost effective manner without sacrificing safety or quality.

We remain hopeful that a global resolution with all parties can be achieved soon and work can begin in earnest to relocate our pipelines. I look forward to working with you and Jon to complete an acceptable A-Date package.

Best Regards,

Don Pozin
Manager, Relocation Projects

1185 Sanctuary Parkway, Suite 100   Alpharetta, Georgia   30009-4765
P.O. Box 1624   Alpharetta, Georgia   30009-9934

colpipe.com | Follow us: